36 P.3d 1278

**Gene Francis STUART, Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 26661.

Supreme Court of Idaho, Lewiston, October 2001 Term.

Dec. 4, 2001.

Randall, Blake & Cox, Lewiston, for petitioner-appellant. Scott M. Chapman argued.

Hon. Alan G. Lance, Attorney General; Kenneth M. Robins, Deputy Attorney General, Boise, for respondent. Kenneth M. Robins argued.

KIDWELL, Justice.

Gene Francis Stuart was convicted of first degree murder by torture and sentenced to death. He appeals the district court's denial of his second petition for post-conviction relief, arguing that the monitoring or recording of telephone conversations between him and his attorney violated his constitutional rights.

## I.

### FACTS AND PROCEDURAL BACKGROUND

In 1982, Gene Francis Stuart (Stuart) was convicted of first degree murder by torture for the beating death of three-year-old Robert Miller, the son of his live-in girlfriend, Kathy Miller. Stuart appealed his conviction and sentence, but this Court affirmed both in *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985) (*Stuart I*). In June of 1986, Stuart filed his first petition for post-conviction relief citing numerous grounds for relief. The district court denied the petition and this Court upheld that decision in *Stuart v. State*, 118 Idaho 865, 801 P.2d 1216 (1990) (*Stuart II*).

Stuart filed a second petition for post-conviction relief, citing new evidence that the Clearwater County Sheriff's Office (CCSO) had recorded confidential conversations be-

tween him and his attorney while Stuart was in jail. Specifically, Stuart questioned the discovery of the names and locations of three women he had been involved with in the past—Sheri Dally, Vicki Nelson, and Theresa Jacobson.[1] These women ultimately testified at his trial, recounting instances of abuse they suffered at the hands of Stuart. Their testimony aided the State in establishing the intent required for a first degree murder by torture conviction. The district court denied his petition again. This Court reversed in *Stuart v. State*, 118 Idaho 932, 801 P.2d 1283 (1990) (*Stuart III*). It first addressed whether a second petition for post-conviction relief could be filed. This Court held that the second petition was timely and proper because the new facts were unknown at the time of the first petition. *Id.* at 934, 801 P.2d at 1285. This Court held that there were sufficient facts to warrant an evidentiary hearing to determine "(1) whether there was recording of attorney-client conversations on the part of the Sheriff's Department and (2) whether the appellant's constitutional rights were violated." *Id.* at 935, 801 P.2d at 1286. The case was remanded to the district court for an evidentiary hearing on the above issues.

The district court bifurcated the hearing into two phases, after determining that if Stuart did not meet his burden of proof on the recording of conversations issue, it would not reach the question of whether his constitutional rights had been violated. Phase I focused solely on the recording of Stuart's conversations with his attorney. After the evidentiary hearing in Phase I occurred, the district court found that there was missing and/or destroyed evidence, which if in existence, would have documented Stuart's telephone use. However, the district court found that Stuart had not established that the State or its agents removed the missing evidence. Therefore, Stuart had not proven

that his conversations with his attorney had been recorded or monitored.

Stuart appealed and this Court remanded the case to the district court. *Stuart v. State*, 127 Idaho 806, 907 P.2d 783 (1995), *cert. denied*, 517 U.S. 1234, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996) (*Stuart IV*).[2] This Court found that the destruction of the missing and/or destroyed evidence could be attributed to the State, that Stuart was entitled to a favorable inference regarding the missing evidence, and that the spoliation doctrine applied in Stuart's favor. The case was remanded, with the district court instructed to determine what should be the scope of the favorable inference. Upon remand, the district court found that Stuart's conversations had been monitored by the CCSO. Based upon the district court's conclusion, the stage was set for Phase II.

Phase II addressed whether Stuart's constitutional rights were violated in light of the monitoring of his protected telephone conversations. Many witnesses either testified at the evidentiary hearing or their depositions were admitted without objection to them being considered the same as live testimony. The witnesses' testimony is summarized from the district court's holding and review of the transcript by the court as follows:

*Nick Albers–Clearwater County Sheriff (at all times relevant to this case)*

Albers testified to the following: he was called to the hospital on September 19, 1981, for what appeared to be a potential case of child abuse. From the beginning, he instructed his investigating team to find Stuart's past friends, family members, and acquaintances to obtain information about him. Because of Stuart's previous contact with the CCSO, Albers had the information necessary to request information from other

---

1. The three women, as well as Kathy Miller, were discussed throughout the proceedings with varying last names; the spellings of all names changed from document to document. Their names will be spelled as they are above throughout the opinion for consistency.

2. While *Stuart IV* was progressing through the judicial system, Stuart filed a third petition for post-conviction relief pursuant to the rule that allows for relief after a prior judgment has been reversed. The district court denied his petition and this Court affirmed. *Stuart v. State*, 128 Idaho 436, 914 P.2d 933 (1996) (*Stuart V*).

law enforcement agencies in other states. Because Stuart was from Montana and because of an investigation involving Stuart and his son, Gene Lee, which mentioned Montana, investigators contacted agencies there. Because the CCSO had the information about a fugitive warrant from King County, Washington, they contacted agencies 'there. He also consulted with experts regarding child abuse in order to determine what questions to ask people being interviewed.

Albers' testimony outlines the investigation—how it progressed, who they contacted, and when information was received. The CCSO had all of the information needed to immediately send out teletype requests to other agencies. The initial contact with King County was through a teletype dated September 19, 1981, at 10:40 p.m. Based on information given to them by Stuart and Miller in initial interviews, the CCSO contacted various locations in Montana on September 20, 1981. On September 24, 1981, a CCSO officer picked up a packet containing background information on Stuart from Ravally County, Montana. Albers points out that finding someone in rural Montana is not that difficult and working with small, rural law enforcement agencies means the officers usually know the people in town. An exhibit, a King County offense report, contains Theresa Jacobson's name. King County officers also helped the CCSO make contact with Vicki Nelson's mom, who helped set up a meeting with Vicki. Stuart and Miller gave information about Sheri Dally. The investigation proceeded naturally—the CCSO followed up on leads received from interviews and the information provided by other agencies. Their investigation led them to all three women.

*Steven Calhoun-former Clearwater County Prosecuting Attorney (currently a Magistrate Judge)*

Calhoun testified to the following: he was familiar with Stuart due to other charges brought against Stuart prior to September 19, 1981. He told Albers on September 19 or 20, 1981, what type of evidence he would need in order to sustain a charge of murder by torture. There was knowledge of Stuart's contacts with Montana and Washington, so the investigation was directed to those states, among others. He became aware of the three women during the investigation. They were very willing to help, but he did not recall how they were located.

*Kathy Miller-former girlfriend of Stuart and mother of victim*

Miller testified to the following: on September 19, 1981, she told investigators about Sheri Dally who lived in Big Fork, Montana. From conversations with Stuart during the time they lived together and Stuart's address book, she knew about and told investigators about a former wife, Vicki, in Seattle.

*Robert Rears-former Clearwater County Deputy Sheriff (currently a school teacher)*

Rears testified to the following: he interviewed Miller on September 19, 1981. She told him that Stuart had an ex-wife, Sheri Dally, who lived with their son in Big Fork, Montana. He conducted numerous interviews with individuals who were believed to have had information about Stuart and his activities. On September 24, 1981, he transported a juvenile to St. Anthony's and stopped in Ravally County, Montana, to pick up background information on Stuart, although his log sheet does not reflect the detour to Montana. An exhibit is a note written by Rears after he took a message from Vicki Nelson, who gave an address and telephone number in Prattville, Alabama.

*Randy Parsons-former Clearwater County Jail Administrator (currently employed by Lewis–Clark State College)*

Parsons testified to the following: exhibits show that he made several telephone calls to Seattle, Washington and Montana on September 20, 1981 and thereafter. The exhibits show that he sent teletypes to obtain information about Stuart soon after his arrest.

*Douglas Graves-former Orofino Police Department patrolman (currently employed by Department of Law Enforcement)*

Graves testified to the following: the investigation was run as a child abuse case.

Contacting former wives, girlfriends, and family members was a proper tool taught at the POST Academy. He accompanied Robert Harrelson, CCSO detective, to Medicine Lake, Montana to interview Sheri Dally. She mentioned Vicki and believed she lived in Woodinville, Washington.

*Robert Harrelson-former Clearwater County detective investigator sergeant (currently chief deputy)*

Harrelson testified to the following: Harrelson interviewed Stuart on September 19, 1981, after the victim's death. Stuart admitted to a former marriage to Sheri Dally, with whom he had a son, Gene Lee. He stated that Dally had lived in Kalispell, Montana, but last he heard, they had moved to Big Fork, Montana. Stuart admitted to being arrested in Orofino on a fugitive warrant.

Harrelson also interviewed Miller with Joan Pare, a social worker, on September 23, 1981, during which Miller referred to Vicki. Harrelson traveled to Medicine Lake, Montana to interview Sheri Dally on September 24, 1981. She also referred to Vicki. Harrelson interviewed Vicki Nelson on October 7, 1981, at her mother's apartment in Renton, Washington. He also interviewed Theresa Jacobson in Wenatchee, Washington. He testified that the investigation always had an emphasis on Stuart's past acquaintances. He recalled that he was given the names, addresses, and telephone numbers of the three women, but he does not remember who provided the information.

*Joan Pare (by deposition)-social worker for Department of Health & Welfare, Division of Family & Children Services*

Pare testified to the following: her first contact with Stuart was the result of a complaint regarding his son, Gene Lee, in April of 1980. She was contacted on September 19, 1981, after the death of the victim and began to gather a social history of Stuart. She met with Stuart on September 22, 1981, and he revealed the names of Sheri Dally and Vicki Owens (Nelson). On September 22, 1981, Pare met with Stuart's mother who talked about Sheri Dally. Pare interviewed Miller on September 20, 1981. Miller showed her Stuart's address book, which included the names of Theresa Jacobson and Vicki Owens (Nelson). The district court concluded that Pare conducted a very thorough background investigation of Stuart.

After the Phase II evidentiary hearing, the district court found that Stuart's constitutional rights had not been violated. The court applied the three exceptions to the exclusionary rule, holding that under the independent origin, inevitable discovery, and attenuated basis exceptions, the monitoring of telephone conversations did not lead to the discovery of witnesses.

It is from this ruling that Stuart timely appeals. He argues that by applying exceptions to the exclusionary rule, the district court did not follow the law of the case established by this Court in *Stuart III*. Stuart argues that the State did not meet its burden of establishing that the evidence in question had an origin independent of the eavesdropping.

## II.

### STANDARD OF REVIEW

A petition for post-conviction relief is a civil proceeding. *Paradis v. State*, 110 Idaho 534, 536, 716 P.2d 1306, 1308 (1986). In a post-conviction proceeding involving a capital crime, the parties have the same burden of proof as a civil litigant. *State v. Pratt*, 125 Idaho 546, 567, 873 P.2d 800, 821 (1993) (preponderance of the evidence standard applies); *see also Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984) (state is required to establish exclusionary rule exceptions by a preponderance of the evidence). The credibility of witnesses, the weight of their testimony, and any inferences drawn are matters resolved by the district court and will not be set aside on appeal unless clearly erroneous. I.R.C.P. 52(a); *Ray v. State*, 133 Idaho 96, 98–99, 982 P.2d 931, 933–34 (1999). Factual findings are clearly erroneous only if not supported by "substantial and competent evidence in the record." *Pace v. Hymas*, 111 Idaho 581, 589, 726 P.2d 693, 701 (1986). This Court freely reviews the district court's application

of the law. *Hollon v. State*, 132 Idaho 573, 576, 976 P.2d 927, 929 (1999).

## III.

## ANALYSIS

### A. The District Court Properly Determined That The Language Used In *Stuart III* Did Not Prohibit The Application Of All Exceptions To The Exclusionary Rule.

█ Stuart argues that this Court established the law of the case in *Stuart III*. Specifically, this Court stated, "if such attorney-client conversations are found to have been recorded, the State will be required to show that the evidence at trial had an *origin independent of the eavesdropping.*" *Stuart III*, 118 Idaho at 935, 801 P.2d at 1286 (emphasis added). Stuart posits that because this Court did not mention other exceptions to the exclusionary rule in its directive to the district court, the lower court was not at liberty to apply them when rendering its decision. Without the exceptions, Stuart argues that the State did not meet its burden of proving that the names and locations of the three women had origins independent of the eavesdropping. Additionally, Stuart focuses on a line of cases that calls for the origin to be "wholly" or "genuinely" independent of any illegality. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Stuart asserts that the State did not establish that it discovered its witnesses through means wholly or genuinely independent of the monitoring of Stuart's conversations.

█ The law of the case doctrine states that "upon an appeal, the Supreme Court, in deciding a case presented states in its opinion a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal...." *Swanson v. Swanson*, 134 Idaho 512, 515, 5 P.3d 973, 976 (2000) (citing *Suitts v. First Sec. Bank of Idaho*, 110 Idaho 15, 21, 713 P.2d 1374, 1380 (1985)). However, the United States Supreme Court noted that the law of the case doctrine "directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

In *Stuart III*, this Court provided little discussion as to why it chose to state that the State had to prove an "origin independent of the eavesdropping." This Court cited *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), as authority for its holding. *Stuart III*, 118 Idaho at 935, 801 P.2d at 1286. *Nardone* not only discusses the independent origin exception, but also discusses what a later U.S. Supreme Court would call the attenuated basis exception. *Nardone*, 308 U.S. at 341, 60 S.Ct. at 267, 84 L.Ed. at 311. The holding in *Stuart III* does not establish that the words used were chosen so as to preclude other exceptions.

This Court has discussed the independent origin and attenuated basis exceptions in reference to search warrants and Fourth Amendment violations. *See State v. Hoak*, 107 Idaho 742, 749–50, 692 P.2d 1174, 1181–82 (1984); *State v. Curl*, 125 Idaho 224, 226–27, 869 P.2d 224, 226–27 (1993). The Idaho Court of Appeals discussed the inevitable discovery and independent origin exceptions in *State v. Holman*, 109 Idaho 382, 391–92, 707 P.2d 493, 502–03 (Ct.App.1985). However, this Court has not previously been presented the opportunity to examine these exceptions and determine their applicability in Idaho. The United States Supreme Court has articulated the three exceptions—independent origin, inevitable discovery, and attenuated basis—in a line of cases dating back to 1939. With no case law from this Court on the subject, it cannot be presumed that this Court has decided that the inevitable discovery and attenuated basis exceptions should not be applied in Idaho. We hold that the law of the case doctrine does not preclude the application of all three exceptions to the exclusionary rule in this case.

### B. The District Court Was Correct In Applying The Three Exceptions To The Exclusionary Rule To The Evidence Presented By The State.

The appellant argues that the district court erred in finding that the State had met its

burden of proof in establishing an origin independent of the eavesdropping for the discovery of the names and locations of Sheri Dally, Vicki Nelson, and Theresa Jacobson. The appellant points to numerous discrepancies in the testimony of the State's witnesses that he believes shows a lack of independent origin. In particular, Stuart points to telephone calls made from the CCSO between September 20, 1981 and September 23, 1981, to all three women, arguing that this shows the CCSO had identified and contacted these women by September 23, 1981. However, Stuart points out that not all of the women's names and locations had been discovered by September 23, 1981. He argues that the reason the CCSO was making telephone calls so soon after his arrest was because they were monitoring his telephone calls with his attorney, Chris Matson. Stuart argues that the outcome of his case may have been vastly different without the testimony of the three women, who provided information that ultimately helped establish the intent requirement for first degree murder by torture.

The district court properly noted in its decision that this Court has never considered the three exceptions to the exclusionary rule. The district court correctly held that the three exceptions to the exclusionary rule— independent source, inevitable discovery, and attenuated basis—should be applied to the facts of this case. Each exception will be analyzed individually.

### 1. Independent Source (Origin) Exception

■ The exclusionary rule bars the admission or use of evidence gathered in violation of the Constitution. In *Stuart III*, this Court relied upon *Nardone* for the premise that "any knowledge wrongfully gained by the government cannot be used against a defendant." *Stuart III* at 935, 801 P.2d at 1286. The facts of *Nardone* also involved the illegal wire-tapping of the defendant's telephone conversations. The *Nardone* court discussed the concept of the independent origin exception, explaining that evidence discovered through illegality may have become so attenuated from the misconduct as to "dis-

sipate the taint." *Nardone*, 308 U.S. at 341, 60 S.Ct. at 267, 84 L.Ed. at 311. The exception provides that evidence may be admitted if it can be shown that it was found through sources unrelated to the illegal conduct. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The exception "teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443, 104 S.Ct. at 2508, 81 L.Ed.2d at 387 (1984).

The United States Supreme Court again addressed the independent source exception in *Murray*. It reiterated that evidence does not need to be excluded if illegally obtained, provided it is also obtained from an independent source. "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *Id.* at 538–39, 108 S.Ct. at 2533–34, 101 L.Ed.2d at 480–81 (quoting *United States v. Silvestri*, 787 F.2d 736, 739 (1986)).

In the present case, the testimony of many witnesses demonstrates that a full-scale police investigation was being conducted from the moment the victim died. From the outset, Stuart was their only suspect, so their efforts focused on him. Investigators had the tools required to begin investigations into Stuart's background—information such as Stuart's name, date of birth, and social security number. Their routine police procedures led them to send inquires to other law enforcement agencies in many Western states, specifically Washington and Montana because of Stuart's known prior connections to both states. During interviews, Stuart and Miller disclosed the existence and general whereabouts of Sheri Dally and Vicki Nelson.

Through diligent police work, members of the CCSO uncovered other, independent

sources that provided leads on all three women. Voluminous exhibits illustrate where, when, and how the women were identified and ultimately located. The monitoring of Stuart's telephone conversations did not provide the only source of information for Dally, Nelson, and Jacobson.

However, the fact remains that telephone calls appear on the CCSO telephone bill to Medicine Lake, Montana, Wenatchee, Washington, and Prattville, Alabama between September 20 and 23, 1981. The investigators, at that point in their investigation, would not have had the information necessary to locate all three women in those towns. Both sides point out that during the Phase I evidentiary hearing, Chris Matson, Stuart's attorney with whom calls were monitored, could not remember the exact dates that he had spoken to Stuart. He also could not remember for which women Stuart had an exact location. These women, in their depositions admitted as testimony for Phase II, did not believe that Stuart knew their whereabouts, citing years of a lack of contact with Stuart. And yet, these telephone calls to the towns in which the women were ultimately found could be cause for question because at that point, investigators would not likely have had an independent source of information for those telephone calls at that particular time. However, the adoption and application of the other exceptions to the exclusionary rule set forth by the United States Supreme Court, effectively eliminates any debate over how and when the officers located the three women.

## 2. Inevitable Discovery Exception

■ The United States Supreme Court adopted the inevitable discovery exception in *Nix*, noting that a "vast majority" of courts recognized such an exception. *Id.* at 440 fn. 2, 104 S.Ct. at 2507 fn. 2, 81 L.Ed.2d at 385 fn. 2. *Nix* dealt with a convicted murderer who petitioned for federal habeas corpus relief. Williams had kidnapped a young girl from a YMCA, killed her, and dumped her body off a stretch of highway in Iowa. An officer transporting Williams upon his arrest gave him what has become known as the "Christian burial speech"—in an effort to get

Williams to give the location of the body, the officer told him that the girl deserved a Christian burial. Williams eventually led police to the girl's body, located approximately two miles from where a search team was searching.

Williams argued that the Sixth Amendment exclusionary rule was developed to protect the integrity and fairness of a trial—he argued that his trial was fundamentally unfair because of the admission of the evidence. After great discussion, the Court disagreed, stating that "the exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Id.* at 446, 104 S.Ct. at 2510, 81 L.Ed.2d at 388. The *Nix* Court discussed the independent source exception, determining that Williams had led them to the body—there was no independent source for that information. However, the Court repeatedly articulated a need not to place police officers in a worse position by excluding evidence they would have eventually found. In adopting the inevitable discovery doctrine, the Court found that the girl's body would have been discovered inevitably by the search team, based on their methodical efforts. As such, excluding evidence that would have inevitably been discovered would not further the purpose behind the exclusionary rule—to deter police misconduct.

In *Murray*, the Court compared the two exceptions—independent source and inevitable discovery and stated that:

> This "inevitable discovery" doctrine obviously assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully.
>
> . . . .
>
> The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.

*Id.* at 539, 108 S.Ct. at 2534, 101 L.Ed.2d at 481 (emphasis in original).

In the present case, as shown by numerous exhibits and witnesses' testimony, the names and locations of all three women were not only inevitably, but in fact, discovered by the investigators through a variety of sources completely unrelated to the monitored telephone calls. To exclude their testimony would not achieve the balance the *Nix* Court sought to reach by adopting the inevitable discovery doctrine.

### 3. Attenuated Basis Exception

 In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States Supreme Court established the attenuated basis exception to the exclusionary rule. *Wong Sun* dealt with a seizure of drugs that would not have been found without the help of the defendant. In stating that not all evidence illegally obtained is automatically the "fruit of the poisonous tree," the Court said "the more apt question . . . is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455. The Court found it crucial to note how attenuated the evidence had become from the initial illegality. If it was inextricably linked to the illegal conduct, then it could not have been so attenuated as to have purged the taint. The *Wong Sun* Court declined to make a distinction between physical and verbal evidence in reference to the exclusionary rule. *Id.* at 486, 83 S.Ct. at 416, 9 L.Ed.2d at 454. However, the Court in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), found a close link between the presence of illegality and the willingness of the witness to testify. It stated:

The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means . . .

. . . .

Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence.

. . . .

And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

*Id.* at 276–77, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

The Court was also concerned that by excluding the testimony of live witnesses, they would be prevented from testifying to relevant facts, no matter how unrelated such testimony might be to the original illegality. *Id.* at 277, 98 S.Ct. at 1060, 55 L.Ed.2d at 277.

In the present case, the investigators testified that all three women willingly cooperated with the investigation and traveled from out of state to testify at Stuart's trial. The testimony of the women themselves shows that their participation in the investigation and their attendance at the trial was voluntary. The fact that each woman traveled from out of state to testify demonstrates the free will exercised by these women with regards to their testimony. Further, all three women testified that they were in hiding from Stuart when they were contacted by members of the CCSO and yet they still took active parts in the investigation. The exercise of free will by Dally, Nelson, and Jacobson provide that which is necessary to establish the attenuated basis exception.

### IV.

### CONCLUSION

The names, locations, and testimonies of Sheri Dally, Vicki Nelson, and Theresa Jacobson came as a result of an intense police investigation, coupled with the witnesses voluntarily coming forward to testify at trial. Although the district court found in Phase I that Stuart's telephone calls had been monitored, the facts of Phase II show that the discovery of these women was not a result of that illegal activity. The law of the case doctrine does not prevent the adoption and application of the exceptions to the exclusion-

ary rule in Stuart's case. We adopt the independent source, inevitable discovery, and attenuated basis exceptions to the exclusionary rule. The district court's denial of Stuart's second petition for post-conviction relief is affirmed.

Justices SCHROEDER, WALTERS, EISMANN and Justice Pro Tem KOSONEN concur.