# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48358

STATE OF IDAHO, )
)
   Plaintiff-Respondent, ) Boise, February 2021 Term
)
v. ) Filed: March 23, 2021
)
MELONIE DAWN SMITH, ) Melanie Gagnepain, Clerk
)
   Defendant-Appellant. )
_____ )

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bingham County. Darren B. Simpson, District Judge.

The judgment of the district court is affirmed.

Eric D. Fredericksen, Idaho Appellate Public Defender, Boise, attorney for Appellant. Brian Dickson argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, attorney for Respondent. Jeff D. Nye argued.

_____

BEVAN, Chief Justice.

This case comes to the Court on a petition for review from the Idaho Court of Appeals. Defendant Melonie Dawn Smith appeals her criminal conviction for first degree murder and destruction, alteration, or concealment of evidence. On appeal, Smith asserts that the district court: (1) erred when it denied her motion to suppress; (2) abused its discretion when it admitted certain testimony over her objection; and (3) committed fundamental error by (a) admitting a video and (b) not striking the prosecutor's comments in closing arguments. Smith further argues that she was deprived of her right to a fair trial due to the accumulation of errors. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 11, 2017, Guy Lopez went to the Bingham County Sheriff's office to report that a friend of his, Melonie Smith, had been involved in the homicide of David Davis. Lopez

1

told the officers that during a drive, Smith confessed she had killed Davis two days earlier and his body was lying in her kitchen. Smith explained that a man named Kevin (later identified as Kevin Day) shot Davis in the legs twice outside of her home. Day then left the scene and Davis entered Smith's home where, after Smith attempted to stop the bleeding, she shot Davis in the head. Smith told Lopez she was so upset by Davis's screams and bleeding that she "shot him in the back of the head like an animal that had been hit by a car." Smith then asked Lopez to help her move the body and her large couch, which had brain material on it, outside the trailer, where she intended to place it over Davis's body, and burn both the couch and the body in an effort to conceal or destroy evidence. Lopez told Sergeant Mark Phillips that he had just come from Smith's home and observed the victim wrapped in plastic. Lopez also saw brain matter in the home and observed blood and human debris dripping down the wall. In addition, Lopez viewed part of the skull, and "bones and stuff," in the wood-burning stove.

Lopez described Smith's home (a double-wide trailer) to the officers, found the location on Google Maps, and identified Smith's address. Lopez detailed that other guns could be found in the home and described one gun (different from the one Smith had used to shoot Davis) behind the front door. Lopez also described all the vehicles that could be found at Smith's house and detailed other buildings on the lot. Lopez drew a diagram of the trailer and a second map with directions to Smith's house. Sergeant Todd Howell articulated to Sergeant Phillips that a search warrant would be necessary. After he finished his interview with Lopez, Sergeant Phillips spoke to other officers and related his concern that Smith would destroy more evidence given her efforts to burn parts of the body in the wood-burning stove. In addition, after the interview concluded Lopez belatedly told Sergeant Phillips that Smith also had a methamphetamine lab outside the home. Sergeant Phillips left the interview room and told officers they would need a hazmat team due to the methamphetamine chemicals, and another officer cautioned Sergeant Phillips that Lopez had told fantastic stories in the past.

Officers were sent to watch Smith's home until the arrival of the officers who were to contact the occupants. Three officers, Detective Randy Herbert, Detective Luis Chapa, and Sergeant Phillips, approached Smith's home around 11 o'clock p.m. The officers knocked on the door and announced that they were with the Bingham County Sheriff's Office. Despite what was described as "freezing cold" temperatures, Smith exited the home, shutting the door behind her, wearing a t-shirt, jeans, and closed-toed shoes.

2

Detective Herbert verified Smith's identity and explained the police received a report about "something going on" and that the officers wanted to come in and see if everything was okay. Smith responded "everything's fine" and that no one inside needed medical attention. Smith said that her mother, Bettie Duke, was the only other person present in the home. Detective Herbert informed Smith that if she refused the request to let to officers look for a person in need of medical attention, the scene would be sealed and both Smith and her mother would have to leave the residence. Smith argued and stated the police could not seal her home without a warrant. At that point, Duke opened the front door, enough only to stand between the door and the doorframe. Smith told Duke that the officers were there to "come in my house and tear my shit apart." The officers objected to this description of their intentions, at which point Smith asked her mother in front of the officers if she was hurt, Duke answered "no."

Smith then turned to the officers and said, "you want to know what happened? Somebody got hurt, and they left." Upon further inquiry, Smith identified the person who got hurt as "David." Smith elaborated that Kevin Day shot David Davis in the leg in Smith's driveway but both men had left the premises. Detective Chapa informed Smith that the officers had information Davis was still in Smith's home, and that he was dead. Smith denied this information. Detective Chapa stated the officers needed to confirm that Davis was not inside the home in medical need. Smith repeatedly denied the officers' requests to search her home and stressed that they needed a search warrant. The officers seized the home in anticipation of getting a search warrant and explained that because the home had been seized, Smith and Duke needed to exit the home. Smith continued to tell the officers that they could not enter her home without a warrant. The officers put Smith in handcuffs. Sergeant Phillips reminded his fellow officers that there were firearms in the home.

After Smith had been removed from the front deck, Detective Herbert knocked on the front door. Duke returned to the door and officers explained the situation to her. Duke affirmed that no one was in the home except Smith and herself. Duke then told the officers she was going into the home to retrieve a coat. Detective Herbert responded that he had to go into the home with her because the property had been seized by the Bingham County Sheriff's Department. As the conversation continued, one of the officers again cautioned that firearms were present in the home and both Duke's and the officers' safety was at risk. Duke finally stated she was too shaky to stand in the doorway. The officers invited her to go inside and sit down but reminded her they

3

would follow her. Duke turned away from the officers and re-entered the home. Despite Duke's oral protests, the officers followed her inside.

Sergeant Phillips' body camera revealed that he and Detective Herbert walked through the home with their guns drawn. One of the officers repeatedly stated, "Sheriff's Office, come out" as they walked through the home. The video from Sergeant Phillips' body camera showed debris lying throughout the scene, as Lopez had described it, and spaces large enough to hold a human body were illuminated with his flashlight. Detective Chapa remained with Duke. In the laundry room, officers discovered a large black bag on the floor. Detective Chapa came in and felt the end of the bag and identified what he believed to be two feet. The bag was not opened, moved, or removed by the officers. The officers removed Duke from the home, sealed the house, and procured a search warrant.

About six hours after Lopez contacted the police, around 3:00 a.m. on February 12, 2017, a search warrant was served to search Smith's home. Inside, the officers found Davis's body wrapped in the black plastic bag as described by Lopez. Smith was charged with murder in the first degree and destruction, alteration or concealment of evidence. Smith moved to suppress the evidence, asserting the search of her house was in violation of the Fourth, Fifth, and Sixth Amendments to the United States Constitution, because the officers' entry into the house was without a warrant, without consent, and not justified by exigent circumstances. The State opposed Smith's motion.

After a hearing, the district court denied Smith's motion to suppress. The court first determined, "[b]ased upon the information known to the officers at the time they secured the home, an exigency existed to preserve evidence of a serious crime." That said, the court found no exigency existed with regard to persons in need of medical attention because the officers knew Davis was already dead. The district court also determined that the officers had reason to believe other persons besides Duke might be in the house, and that they might be armed and dangerous; thus, when Duke reentered the house after it was seized, the officers had reason to escort her and conduct a protective sweep for officer safety. The district court held the discovery of Davis' body in the plastic bag occurred in plain view during the protective sweep. Further, the court determined that "even if the officers' warrantless entry into Smith's home had been illegal . . . the evidence seized pursuant to the Warrant would have inevitably been discovered."

4

Smith's case proceeded to trial. During trial, the State sought to introduce Exhibit 4 into evidence, which contained Sergeant Phillips' body camera footage depicting Smith's repeated refusals to allow the officers into her home. Smith's attorney objected, stating he expected that Lopez would testify before the exhibit was admitted because the officers' claim that "We have information out here that someone needs medical assistance" stemmed from Lopez's statements. Smith's counsel explained he thought the police officers were exaggerating because that is not what Lopez said. Thus, Smith's attorney lodged a conditional objection, arguing there may not be sufficient foundation for the video if Lopez does not testify first. The district court overruled the objection, provided the State lay the proper foundation for its admission. Later, when the State moved to admit Exhibit 4 during Sergeant Phillips' testimony, the district court found sufficient foundation had been laid and admitted Exhibit 4.

Later in trial, during Sergeant Phillips' testimony, the prosecutor also moved to introduce Exhibit 7, which contained the video made from Sergeant Phillips' dashboard camera. Exhibit 7 was admitted without objection and revealed the same conversation as Exhibit 4.

The State called Duke to testify at trial. Among other things, Duke testified that after she was taken to the Bingham County Sheriff's office her other daughter and her grandson, Kellie and Jeremy Leslie, picked her up and took her to Boise. Duke testified she did not remember talking to the Leslies about what had happened nor did she remember telling them that Smith had said she shot Davis. However, Kellie Leslie later testified that during the drive to Boise, Duke made several statements about what had occurred at Smith's home. When the prosecutor asked, "[a]nd what was it [Duke] was talking to you about," Smith objected that the answer would be hearsay. The district court overruled the objection. Kellie then testified that Duke told her someone had been shot at Smith's house, specifically that Smith had shot someone in the head. Kellie also testified Duke said Smith put alcohol in his wounds before she shot him in the head, and she later wrapped the body in plastic. Kellie testified that Duke stated Davis was "crying like a little bitch" and Smith said something about putting him out of his misery like an animal.

Jeremy Leslie testified similarly that Duke talked about what had happened during the drive to Boise. When the prosecutor asked him, "[a]nd what did she indicate had occurred," Smith again objected on the basis of hearsay. The district court overruled the objection. Jeremy then testified Duke stated someone had been killed in the house but that she did not see anything,

5

she only heard the gunshots. Jeremy did not remember anything about what Duke had heard from Smith or about putting anyone out of his misery like you would an animal.

Smith took the stand in her own defense. Smith testified that after Day shot Davis in the legs and left in his car, he returned to Smith's home and shot Davis in the head. Smith testified she did not contact the police because she feared Day might come back and shoot her. Smith was not strong enough to move the body on her own, so she asked Lopez for help. Smith stated that Lopez helped her move the body, wrap it, and clean parts of the house. Smith also explained that when the officers first came to her house she did not let them search her house because she "was afraid that they'd not handle the evidence correctly" and she "had some concerns about [her] mom's weed pipes and some drug paraphernalia."

During closing arguments, the prosecutor used Smith's repeated refusals to consent to the search of her house to impeach her version of events:

> Now, if we take the defendant's version and the defendant's version today [sic]—
> I don't want to tell you how to consider what she's said, but I want to point out
> those inconsistencies that she's had.
>
> When law enforcement arrived at her residence . . . she told them that Kevin had
> shot David Davis in the legs and that he had left. No one was hurt there. No body
> was there. Nothing happened inside the residence. They just needed to leave and
> go about their business.
>
> That's what she wanted them to do, because she had something to hide. She
> preferred that's what they would do, because she had something to hide. She had
> the body of David Davis to hide . . . .

During deliberations, the jury asked to see Exhibit 4. Ultimately, the jury found Smith guilty of first-degree murder and destruction of evidence. The district court sentenced Smith to a fixed and determinate sentence of life for murder in the first degree, and a concurrent unified term of five years, of which four years were fixed and determinate, for the destruction, alteration, or concealment of evidence. Smith timely appealed.

The case first came to the Idaho Court of Appeals, which affirmed the district court's judgment of conviction. This Court granted review.

## II. ISSUES ON APPEAL

1. Did the district court err in denying Smith's motion to suppress?
2. Did the district court abuse its discretion in overruling Smith's hearsay objections to the Leslies' testimony?

**3.** Has Smith shown fundamental error in the admission of Exhibit 4 and the prosecutor's closing argument?

**4.** Even if any errors are individually harmless, did the accumulation of errors deprive Smith of her right to a fair trial?

## III. STANDARD OF REVIEW

"When reviewing a case on petition for review from the Court of Appeals this Court gives due consideration to the decision reached by the Court of Appeals, but directly reviews the decision of the trial court." *State v. Gonzales*, 165 Idaho 667, 671, 450 P.3d 315, 319 (2019) (quoting *State v. Schmierer*, 159 Idaho 768, 770, 367 P.3d 163, 165 (2016)).

"When this Court reviews a district court's order granting or denying a motion to suppress, "the standard of review is bifurcated." *Id.* (quoting *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *Id.* (citing *State v. Watts,* 142 Idaho 230, 232, 127 P.3d 133, 135 (2005)). Even so, "this Court may freely review the trial court's application of constitutional principles in light of the facts found." *Id.* (citing *State v. Diaz,* 144 Idaho 300, 302, 160 P.3d 739, 741 (2007)).

## IV. ANALYSIS

**A.    We affirm the district court's denial of Smith's motion to suppress.**

The district court denied Smith's motion to suppress after concluding exigent circumstances supported the officers' warrantless entry into Smith's home based on the imminent risk of destruction of evidence. The district court also determined that once Smith's home was seized, the officers had reason to accompany Duke inside when she reentered the home and to conduct a protective sweep for the officers' safety. Last, the district court concluded the victim's body would have inevitably been discovered when the warrant was served.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *State v. Maxim*, 165 Idaho 901, 904, 454 P.3d 543, 546 (2019) (quoting *Carpenter v. United States*, — U.S. — , 138 S. Ct. 2206, 2213 (2018)). The United States Supreme Court has recognized that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*,

407 U.S. 297, 313 (1972). Searches and seizures inside a home without a warrant are presumptively unreasonable. However, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (*per curiam*)). The State bears the burden to show that a warrantless search either fell within one of these well-recognized exceptions to the warrant requirement or was otherwise reasonable under the circumstances. *State v. Anderson*, 140 Idaho 484, 486, 95 P.3d 635, 637 (2004) (internal citation omitted).

> *a.  We affirm the district court's holding that the imminent risk of destruction of evidence permitted the officers' warrantless entry into Smith's home.*

First, the district court analyzed whether exigent circumstances existed to permit the warrantless entry into Smith's home. "[W]arrants are generally required to search a person's home . . . unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *State v. Sessions*, 165 Idaho 658, 661, 450 P.3d 306, 309 (2019) (quoting *Stuart*, 547 U.S. at 403). "The [exigent circumstances] exception applies where the facts known at the time of the entry indicate a 'compelling need for official action and no time to secure a warrant.' " *State v. Smith*, 144 Idaho 482, 485–86, 163 P.3d 1194, 1197–98 (2007) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)).

A warrantless search under the exigent circumstance exception must be strictly circumscribed by the nature of the exigency that justifies the intrusion. *State v. Smith*, 159 Idaho 865, 868–69, 367 P.3d 260, 263–64 (Ct. App. 2016) (citing *State v. Buterbaugh*, 138 Idaho 96, 99, 57 P.3d 807, 810 (Ct. App. 2002)). The exigent circumstance exception does not apply when there is time to secure a warrant. *Id.* (citing *State v. Robinson*, 144 Idaho 496, 501, 163 P.3d 1208, 1213 (Ct. App. 2007)). "In determining whether the officers reasonably feared imminent destruction of evidence, the appropriate inquiry is whether the facts, as they appeared at the precise moment in question, would lead a reasonable, experienced officer to believe that evidence might be destroyed before a warrant could be secured." *State v. Holton*, 132 Idaho 501, 504, 975 P.2d 789, 792 (1999).

The district court denied Smith's motion to suppress after concluding exigent circumstances regarding preservation of evidence supported the officers' warrantless entry into

Smith's home. The exigent circumstances exception applies to the facts known at the time of entry. *Smith*, 144 Idaho at 485–86, 163 P.3d at 1197–98. When Detectives Herbert, Chapa, and Phillips arrived at Smith's home they knew the following: a violent crime had been committed on Smith's premises—Davis had been shot both inside and outside the home, and that Davis was dead (Lopez reported to the police that he had seen Davis's body); Smith was actively attempting to destroy evidence by burning parts or all of the victim's body in her wood stove and cleaning blood and brain material from the wall; Smith tried to recruit Lopez to help her move Davis's body; and Smith intended to burn the couch, which contained blood and brain matter, and what remained of Davis's body, outside her home. The district court determined that given the severity of the legal penalties to the activity that took place in Smith's home (murder in the first degree), together with Lopez's detailed description of Smith's efforts to destroy evidence, it was reasonable under these circumstances for the officers to enter Smith's home without a warrant.

Smith does not challenge the district court's findings of fact. Instead, Smith cites *Illinois v. McArthur*, 531 U.S. 326 (2001), to argue the officers failed to narrowly tailor their entry into her home. In *Illinois v. McArthur*, officers told the defendant he could not reenter his home unaccompanied after they were notified drugs were inside. *Id*. at 329. The defendant went into his house on several occasions, but an officer merely stood in the doorway and observed the defendant. *Id*. Smith argues the intrusion into her home was nowhere near so narrowly tailored to preserve evidence. In particular, Smith argues that once she was detained outside her home any reasonable fear that she could immediately destroy evidence was gone. Moreover, Smith contends, "the fact that Ms. Duke was still inside the house, without more, was not sufficient to create a reasonable fear of imminent destruction of evidence."

The State cites three compelling reasons the officers could have continued to fear the imminent destruction of evidence. First, it was reasonable to believe that other persons besides Duke might be in the house. There were five vehicles parked in the driveway and the officers knew Smith had contacted at least one individual—Lopez—to help her destroy evidence. The State contends the exigency did not end until the officers could confirm no one else was in the home. Second, based on Lopez's statement that Smith had placed at least part of the skull and "bones and stuff" in the wood-burning stove, evidence could have continued to be destroyed without anyone being present in the home. Third, Smith's home was dark and cluttered, making it difficult for the officers to see what Duke was doing if she went into home unaccompanied.

9

For all the officers knew, when Duke turned away and reentered the home she could have gone to the wood-burning stove or taken some other action to destroy evidence. In support of this inference, the State highlights that as far as the officers knew, Duke had seen Smith commit murder two days prior, made no effort to report the murder, and made no mention of the murder when the officers showed up on Smith's front porch. Thus, it was reasonable for the officers to suspect that Duke was protecting her daughter, and could have been willing to destroy evidence to do so.

Based on Lopez's statements, it was reasonable for the officers to infer that Smith could have continued to destroy evidence herself, Duke could have destroyed evidence, or Smith could have contacted someone else to destroy the evidence after Lopez declined to help her. In addition, evidence could have been destroyed simultaneously with the officers' investigation. In particular, the fact that Lopez observed part of the skull, and "bones and stuff" in the wood-burning stove an hour before he went to the police station, is compelling evidence that Smith's efforts to destroy evidence could have been ongoing and continuing – even after she was detained. Thus, the officers had reason to be concerned that the time it would take to obtain a warrant might allow evidence of a violent crime to be destroyed. The district court's finding that exigent circumstances supported the officers' warrantless entry into Smith's home is supported by substantial evidence.

> b. *We affirm the district court's holding that it was reasonable for the officers to conduct a protective sweep when they accompanied Duke into Smith's home after it had been seized.*

Next, the district court considered whether the protective sweep exception to the warrant requirement applied. "[F]ollowing the in-home arrest of a suspect, the police could conduct a protective sweep of the premises provided that they had a reasonable, articulable suspicion 'that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *State v. Revenaugh*, 133 Idaho 774, 776, 992 P.2d 769, 771 (1999) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). The protective sweep exception may apply when a suspect is detained rather than formally arrested. *Id.* at 777, 992 P.2d at 772. No individual fact, including absolute proof that someone is inside the home, is necessary if the combination of circumstances creates a reasonable, articulable suspicion that someone might be in the residence who could pose a threat to the officers on the scene. *Id.* at 778, 992 P.2d at 773. The sweep must be confined to a cursory

10

inspection of those spaces where a person may be found and may not last longer than necessary to dispel the reasonable suspicion of danger. *Buie*, 494 U.S. at 335–36.

Here, the district court found that a protective sweep of Smith's home was warranted for several reasons. First, the officers were aware that a shooting had taken place on the premises: Lopez told them Smith's story that both Kevin and Smith shot the victim. Once the officers arrived at the home, Smith confirmed that David had been shot on the premises by Kevin. Lopez also cautioned officers that guns were located in the home. The officers observed five vehicles parked in Smith's driveway, giving officers reason to believe other persons besides Duke may be in the home and that they might be armed and dangerous. Last, the officers had information on drug use and production at the scene. Based on these facts, the district court found that when Duke reentered the home, after being told the house had been seized and she could not reenter without an officer, the officers had reason to escort her and conduct a protective sweep of the house for purposes of officer safety.

Smith contends these facts do not rise to the level of reasonable, articulable suspicion that the house was harboring an individual posing a danger to those on scene at the time officers detained Smith. In support, Smith highlights that Lopez told the officers that Kevin shot Davis two days before Lopez met with the officers, and he did not suggest that Day had returned to the scene. Nor did Lopez suggest anyone besides himself had been at the house to help Smith with the body or the cleanup. Smith also claims that Lopez had informed the officers Smith kept multiple vehicles in the driveway, and given that people living in rural areas often own multiple vehicles, the fact that there were five vehicles in the driveway could not support a suspicion that anyone besides Smith and Duke were in the home. The State counters that Lopez told the officers Smith had four cars parked outside her house, thus, at the very least, the fifth car gave the officers reason to believe that someone else could have arrived at Smith's home since Lopez left the premises.

The State asserts that our decision in *State v. Revenaugh,* is dispositive of the protective sweep issue. In *Revenaugh*, a deputy was dispatched to a business on a malicious injury to property call. 133 Idaho at 775, 992 P.2d at 770. The deputy discovered four bullet holes that appeared to have been shot from a residence about fifty yards away. *Id*. When the deputy went to the home, he observed three individuals around two large, black, plastic garbage bags, and one small, clear baggie. The deputy smelled the strong odor of marijuana and observed one of the

11

men holding a green stalk, apparently trimming leaves. *Id*. The deputy yelled, "stop" and then heard someone from the house yell "cop" as the door was slammed shut. *Id*. The deputy pushed the door open and ordered everyone to exit the house. The deputy read Revenaugh, the renter of the home, his *Miranda*[1] warnings and asked for permission to search the residence. Revenaugh denied the request. *Id*. At that point, the deputy summoned other officers for assistance, and they conducted a protective sweep of the home to make sure no one else was inside. *Id*. Revenaugh moved to suppress the evidence, arguing that the deputy's initial warrantless entry in the residence was unlawful. *Id*.

This Court affirmed the district court's denial of Revenaugh's motion after holding the protective sweep exception justified the officers' warrantless entry. *Id*. The Court held the protective sweep exception only required some kind of "custodial situation" rather than a formal arrest because the distinction between "detention" and "formal arrest" is negligible for purposes of officer safety. *Id*. at 777, 992 P.2d at 772. The Court also held that the protective sweep exception could apply when the suspect is detained outside the residence because "[a] bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another." *Id*. at 778, 992 P.2d at 773 (quoting *United States v. Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989)). Additionally, the Court held an officer's reasonable, articulable suspicion that a dangerous person could be inside the house was enough to justify the protective sweep even if there was not absolute proof someone else was inside the residence. *Id*. Specifically, the Court relied on the deputy's testimony that he could not see into the house, that Revenaugh had retreated into the house, and that there was apparently a marijuana operation, which in the deputy's training and experience, often involved paranoid people and weapons. *Id*.

As in *Revenaugh*, Smith was in a custodial situation, detained outside her residence. Additionally, the officers could not see into Smith's home because they approached the home at night and Sergeant Phillips described the area around the house was "all blacked out." Lopez described multiple guns in Smith's home, including a gun behind the front door. Lopez had reported two serious crimes of violence—Day shooting Davis in the legs and Smith shooting Davis in the head. Smith admitted to the officers that Davis had been shot on her property and that she failed to call the police. It was also reasonable for the officers to fear Smith had

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

contacted someone else to clean up the evidence after Lopez declined to help. Although Smith argues that the officers who had been surveilling the scene before she was detained reported no one coming or going, officers did not arrive on the scene until after Lopez contacted the police, which occurred an hour after he left Smith's home. An hour provides sufficient opportunity for someone else to have come to Smith's home before officers arrived on the scene. The officers were justified in performing a protective sweep when they accompanied Duke into the home because it was reasonable to fear someone might be in the residence who posed a threat to the officers.

c. *We affirm the district court's holding that the inevitable discovery doctrine applied.*

Last, the district court considered whether the doctrine of inevitable discovery applied. The United States Supreme Court set out the inevitable discovery doctrine in *Nix v. Williams*, 467 U.S. 431, 444 (1984), stating:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*State v. Downing*, 163 Idaho 26, 31, 407 P.3d 1285, 1290 (2017). "[T]he inevitable discovery doctrine asks courts to engage in a hypothetical finding into the lawful actions law enforcement *would have inevitably taken* in the absence of the unlawful avenue that led to the evidence. *Id*. (citing *Nix*, 467 U.S. at 459 (Brennan, J., dissenting) (emphasis in original); *see also Stuart v. State*, 136 Idaho 490, 497, 36 P.3d 1278, 1285 (2001). The premise is that law enforcement should be "in the same, not a worse, position that they would have been" absent the misconduct. *Id*. (quoting *Nix*, 467 U.S. at 443). "The [inevitable discovery] doctrine 'is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did.' " *Id*. at 32, 407 P.3d at 1291 (quoting *State v. Holman*, 109 Idaho 382, 392, 707 P.2d 493, 503 (Ct. App. 1985)).

Smith argues the inevitable discovery doctrine does not apply to prevent the suppression of the evidence gained from the unlawful search because the search warrant was based in part on information obtained during that unlawful search. We rejected a similar argument in *Revenaugh*, holding that when an officer's first warrantless entry into a residence falls within the protective sweep exception to the warrant requirement, any evidence discovered during that sweep can be

13

properly included in the application for the search warrant. 133 Idaho at 778–79, 992 P.2d at 773–74. Because we have held the officers were justified in performing a protective sweep when they accompanied Duke into the home, we likewise hold that any evidence discovered during that sweep could have been considered in the officer's application for a search warrant.

Even if we found the application for the search warrant contained illegally obtained information, the ultimate question is whether "the remaining information presented to the magistrate, after the tainted evidence is excluded, contains adequate facts from which the magistrate could have concluded that probable cause existed for the issuance of the search warrant." *Revenaugh*, 133 Idaho at 779, 992 P.2d at 774 (quoting *Doe v. State*, 131 Idaho 851, 853, 965 P.2d 816, 818 (1998)). Here, Lopez told the officers that Smith had confessed, "she grabbed a handgun and put it to the back of David Davis's head and pulled the trigger" inside her home. In addition, Lopez told the officers he saw "a body wrapped in plastic inside [Smith's] home," "residue of blood" on the walls, and "brain matter, a skull cap and other bone fragments" in the wood-burning stove. The information provided by Lopez was sufficient probable cause for a search warrant independent of what the officers observed in Smith's home. Thus, we affirm the district court's holding that Davis's body and the evidence of his murder would have been discovered through the inevitable discovery doctrine.

**B.    The district court did not abuse its discretion in overruling Smith's hearsay objections at trial.**

Next, Smith argues the district court abused its discretion by allowing the Leslies' hearsay testimony to be admitted for the truth of the matter asserted, and that the error was compounded when the prosecutor referenced the Leslies' testimony during closing arguments. The State counters the district court properly overruled Smith's objection because the prosecuting attorney introduced Duke's statements through the Leslies to impeach Duke, not for the truth of the matter asserted. As a result, the statements were not hearsay.

"The trial court has broad discretion in the admission of evidence, and its judgment will be reversed on appeal only when there has been an abuse of discretion." *State v. Bush*, 131 Idaho 22, 34, 951 P.2d 1249, 1261 (1997) (citing *State v. Zichko*, 129 Idaho 259, 264, 923 P.2d 966, 971 (1996)). This Court reviews an alleged abuse of discretion by determining whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices

available to it; and (4) reached its decision by the exercise of reason." *State v. Christensen*, 166 Idaho 373, ___, 458 P.3d 951, 954 (2020) (citing *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)). "Even if evidence was admitted in error, this Court will not grant relief if we find the error to be harmless." *Id*. (quoting *State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015)).

Hearsay is generally inadmissible absent an applicable exception. I.R.E. 802. The Idaho Rules of Evidence define hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. I.R.E. 801(c). Prior inconsistent statements used to impeach a witness "are not hearsay because they are not offered for the truth of any facts asserted, but rather, solely to impeach the credibility of the witness." *State v. Koch*, 157 Idaho 89, 103, 334 P.3d 280, 294 (2014). "A witness's credibility can be impeached by any party, including the party which called the witness." *Id.* (citing I.R.E. 607). Put simply, "an out-of-court statement offered to impeach a witness's credibility is not hearsay." *Herrick v. Leuzinger*, 127 Idaho 293, 304, 900 P.2d 201, 212 (Ct. App. 1995). In such circumstances it is not the truth of the statement that has evidentiary value, but rather its juxtaposition against the inconsistent testimony of the witness. *Id*.

The crux of this issue is the purpose behind Kellie and Jeremy Leslie's testimony at trial. During trial, Duke denied making several statements. On appeal, Smith focuses on three of Duke's statements. First, Duke testified she did not recall Smith telling her Davis "was put out of his misery." Second, Duke denied that she heard Smith rustling some plastic after hearing gunshots, testifying instead that while she first thought it was Smith, it turned out to be one of their dogs. Third, Duke denied talking to the Leslies about what happened on the night in question.

After Duke testified at trial, the prosecutor presented testimony from Kellie and Jeremy Leslie to contradict Duke's denials. Kellie Leslie testified:

> Q. And during that trip, did your mother make any statements to you about anything that had occurred?
>
> A. She did.
>
> Q. And what was it she was talking to you about?
>
> Mr. Archibald: I'll object, Your Honor, to hearsay.
>
> The Court: Overruled.

15

The Witness: She was talking about what had happened at Melonie's house, that someone had been shot.

. . . .

Q. What else did she tell you?

A. She said that – about wrapping the body in plastic and that she had asked Melonie "Are you going to do the black plastic or the white plastic?"

Q. And do you recall anything else that she said?

A. Well, she said that they had put alcohol in his wounds prior to him being shot in the head.

. . . .

Q. And then what happened? Then what did she say happened?

A. Let me think back. "And that he was crying like a little bitch" was what my mom said.

Q. And did she say something about putting that person out of their misery or anything along those line[s]?

A. She said something like, you know, like, with an animal, that she put them out of their misery.

Q. Okay. And did she say who did that specifically with regards to putting them out of their misery?

A. She said that Melonie had.

The next witness the State called was Jeremy Leslie, who testified:

Q. And you picked up – did you pick your grandmother up?

A. Yeah. A little bit, yeah.

Q. And did she talk about what had happened?

A. A little bit, yeah.

Q. Okay. And what did she indicate had occurred?

Mr. Archibald: I'll object, Your Honor, to hearsay.

The Court: Overruled.

The Witness: Do I go ahead or –

Q. (By Mr. Colson) Yeah. Go ahead.

A. Okay. She – she said that there had been – somebody had been killed and that it had taken place at their house, that a gentleman was shot outside of the house, brought into the house, and that – she said she didn't see anything, but she heard gunshots.

16

On appeal, Smith argues that since none of Duke's statements to the Leslies were made under oath, they could not be admitted for the truth of the matter asserted under Idaho Rule of Evidence 801(d)(1)(A). In making this argument, Smith concedes "the prosecutor . . . presented testimony from both Kellie and Jeremy Leslie to contradict Ms. Duke's denials." Because "an out-of-court statement offered to impeach a witness's credibility is not hearsay," *Herrick*, 127 Idaho at 304, 900 P.2d at 212, we hold the district court did not abuse its discretion in overruling Smith's objections.

Still, Smith claims that in closing arguments the prosecutor presented the Leslies' testimony for the truth of the matters asserted when he argued:

> But then you also heard from the Leslies—Kellie Leslie and Jeremy Leslie—who both were present while giving Bettie Duke a ride back to Boise, and [Duke] told them that [Smith] had shot [Davis] in the head. So we have that specific version that the Defendant would like to not have been the result, but ultimately, based on the evidence, it is.

Smith argues the prosecutor's closing argument shows the erroneously-broad scope of the district court's ruling. However, Smith did not object to the prosecutor's closing argument at trial nor has she argued that his comments amounted to fundamental error on appeal. Thus, Smith has waived any argument stemming from the prosecutor's comments during closing argument related to the Leslies' testimony. *Murray v. State*, 156 Idaho 159, 168, 321 P.3d 709, 718 (2014) ("A party waives an issue cited on appeal if either authority or argument is lacking, not just if both are lacking.") (Internal quotation omitted).

The State also argues Smith could have, but did not, ask for a limiting instruction concerning the Leslies' testimony. Smith counters that a similar argument was rejected by the court of appeals in *State v. Gerardo*, 147 Idaho 22, 205 P.3d 671 (Ct. App. 2009). Specifically, Smith cites *Gerardo*, for the proposition that the trial court must identify that evidence is being admitted for a limited purpose in order to put the parties on notice that a limiting instruction may be requested. Idaho Rule of Evidence 105 provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party for another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly." I.R.E. 105 (2017) (emphasis added)[2]. Importantly, the Rule specifies that a

---

[2] In July 2018, Idaho Rule of Evidence 105 was amended to read, "If the court admits evidence that is admissible against a party or for a purpose – but not against another party or for another purpose – the court, on timely request,

17

limiting instruction is appropriate upon request by a party. Smith did not request any such instruction in this case and the district court was under no obligation to instruct the jury *sua sponte* on the limited purpose of the admitted evidence. *See State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (finding no error where the district court failed to give a limiting instruction when it admitted impeachment evidence because "there is nothing in [Rule 105] that requires the giving of a limiting instruction absent a request from [the defendant])."

Ultimately, the context of the Leslies' testimony suggests the State intended to use the testimony to impeach Duke's credibility. The State called the Leslies to testify immediately after Duke denied having any substantive conversations with them on the drive to Boise. The prosecutor's questions were narrowly tailored to contradict Duke's assertions. Thus, the district court did not abuse its discretion in overruling Smith's hearsay objections. Because we have held the district court did not abuse its discretion, we need not consider the State's claim that any error was harmless.

## C.     Smith has failed to prove fundamental error in the admission of Exhibit 4 or the prosecutor's closing argument.

As noted, during trial, the State moved to admit Exhibit 4—Sergeant Phillips' body camera video, which showed the initial conversation with Smith refusing to consent to a search of her home and the subsequent entry into and the sweep of her home. Smith objected on the narrow foundational ground that Lopez's testimony was required to establish foundation for Exhibit 4 before it could be admitted. The district court overruled her objection. Thereafter, Smith claims the prosecutor expressly referenced her refusals during closing arguments to impeach her version of events and to argue to the jury that it should infer guilt from her refusal to consent to a search.

Smith now argues the admission of Exhibit 4 and the prosecutor's closing argument impermissibly commented on Smith's invocation of her Fourth Amendment rights. Smith contends her claims must be reviewed under Idaho's fundamental error doctrine because she did not object on this basis below. *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010). We have never directly held that a defendant can assert a constitutional challenge on appeal after objecting to the admission of the same evidence on a different ground below. However, in *State*

---

must restrict the evidence to its proper scope and instruct the jury accordingly." The substance of the Rule remains unchanged.

*v. Bodenbach*, 165 Idaho 577, 448 P.3d 1005 (2019), and *State v. Easley*, 156 Idaho 214, 322 P.3d 296 (2014), we entertained the defendants' unobjected-to claims of constitutional error under the fundamental error doctrine, even though the defendants objected on different grounds below. In *Bodenbach*, a defendant lodged a general objection to the trial court's initial aggressor instruction. *Id*. at 583, 448 P.3d at1011. The defendant appealed, arguing the trial court's instruction misstated the law, was unclear and vague, and relieved the State of its burden of proving the killing was unlawful. On appeal we found that, while Bodenbach had objected to the instruction below, he had only done so because the instruction was not appropriate under Idaho law and, as such, that was the only issue that was preserved. *Id*. at 584, 448 P.3d at 1012. We explained the other issues "would only be reviewable under the fundamental error test because defense counsel did not preserve an objection to the instruction on those grounds." *Id*. (citing *Perry*, 150 Idaho at 228, 245 P.3d at 980). After conducting a fundamental error analysis, we ultimately held the defendant could not satisfy the third prong of *Perry*. *Id*. at 588, 448 P.3d at 1016.

Likewise, in *Easley*, the defendant objected to the prosecutor's ability to prevent the district court from considering her for mental health court. 156 Idaho at 221, 322 P.3d at 303. The trial court overruled her objection. *Id*. On appeal, Easley argued for the first time that the prosecutor's power to veto the district court's ability to place a probationer in mental health court violated Idaho's Separation of Powers Doctrine. *Id*. at 221, 322 P.3d at 303. Because she did not raise the separation of powers issue in the district court, Easley raised the claim as one of fundamental error. We analyzed Easley's claim under the fundamental error doctrine on appeal, ultimately finding Easley satisfied all three prongs. *Id*.

We now clarify and hold that a defendant who objects to the admission of evidence on one ground below is not precluded from asserting a constitutional challenge to that same evidence under the fundamental error doctrine on appeal. In *State v. Bingham*, 116 Idaho 415, 423, 776 P.2d 424, 432 (1989), this Court adopted the following definition of fundamental error:

> Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. Each case will of necessity, under such a rule, stand on its own merits. Out of the facts in each case will arise the law.

19

*State v. Christiansen*, 144 Idaho 463, 470, 163 P.3d 1175, 1182 (2007). At other times, the Court defined fundamental error as "error which 'so profoundly distorts the trial that it produces manifest injustice and deprives the accused of his constitutional right to due process.' " *Id.* (quoting *State v. Sheahan*, 139 Idaho 267, 281, 77 P.3d 956, 970 (2003)). To show fundamental error, the defendant must demonstrate:

> (1) that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*State v. Garcia*, 166 Idaho 661, ___, 462 P.3d 1125, 1141 (2020) (quoting *Perry*, 150 Idaho at 226, 245 P.3d at 978).

> a. *The admission of Exhibit 4 and the prosecutor's comments referencing Exhibit 4, constituted improper comment on Smith's exercise of her Fourth Amendment rights.*

Smith argues her constitutional rights were violated because of the admission of Exhibit 4 and the prosecutor's comments referencing the exhibit during closing arguments were used to imply Smith's guilt because she exercised her Fourth Amendment rights. In general, "[t]he same rationale that precludes evidence of an accused's assertion of his or her Fifth Amendment Rights offered for the purpose of either impeachment or inferring guilt precludes evidence of the accused's assertion of his or her Fourth Amendment rights offered for the same purposes." *Christiansen*, 144 Idaho at 470, 163 P.3d at 1182; *see also State v. White*, 97 Idaho 708, 551 P.2d 1344 (1976) (holding it constituted fundamental error for the prosecutor to elicit testimony about the defendant's post-arrest silence, whether his purpose was to raise an inference of guilt or to impeach the defendant's trial testimony).

Smith claims that the error in admitting Exhibit 4 was compounded during closing arguments, when the prosecutor expressly used Smith's exercise of her Fourth Amendment rights to impeach her version of events and argue the jury should infer guilt from them:

> Now, if we take the defendant's version and the defendant's version today [sic]—I don't want to tell you how to consider what she's said, but I want to point out those inconsistencies that she's had.

20

> When law enforcement arrived at her residence . . . she told them that Kevin had shot David Davis in the legs and that he had left. No one was hurt there. No body was there. Nothing happened inside the residence. They just needed to leave and go about their business.
>
> That's what she wanted them to do, because she had something to hide. She preferred that's what they would do, because she had something to hide. She had the body of David Davis to hide . . .

Smith argues that this Court once found similar conduct by a prosecutor constituted a violation of a defendant's Fifth Amendment rights in *State v. Skunkcap*, 157 Idaho 221, 233–35, 335 P.3d 561, 573–75 (2014). In *Skunkcap* this Court held the prosecuting attorney violated the defendant's unwaived constitutional right to remain silent when he called a detective to testify that the defendant had refused to answer his questions in an interview. *Id*. at 233, 335 P.3d at 573. The Court stated that the sole purpose of the testimony was to have the jury infer the defendant must be guilty because he would not talk after he was arrested. *Id*. The Court determined even though the defendant did not object to the testimony, the first two prongs of the fundamental error test were satisfied because the attempt to use that evidence to infer the defendant's guilt violated the Fifth Amendment and was clear from the face of the transcript. *Id*. at 235, 335 P.3d at 575.

Smith contends the same violation occurred in her case and that it is even more apparent than in *Skunkcap*. Smith alleges the prosecutor expressly argued to the jurors that they should draw impermissible inferences in his closing remarks by stating Smith told the officers "[t]hey just needed to leave and go about their business. That's what she wanted them to do, *because she had something to hide*. She preferred that's what they would do, *because she had something to hide*. *She had the body of David Davis to hide* . . . ." (Emphasis added by Appellant). The State concedes that a prosecutor is not allowed to comment on a defendant's exercise of a constitutional right. *See State v. Jeske*, 164 Idaho 862, 868, 436 P.3d 683, 689 (2019) (acknowledging that "a prosecutor may not constitutionally comment on a defendant's invocation of his Fourth Amendment rights."). Even so, the State contends any comments "must be evaluated in light of defense conduct and in the context of the entire trial." *State v. Folk*, 162 Idaho 620, 634, 402 P.3d 1073, 1087 (2017). Simply put, the State argues that a defendant may not use a constitutional right as both a shield and a sword, i.e., if a defendant explains to the jury why she exercised her constitutional right, the prosecutor can respond by explaining the State's view of why the defendant exercised that right.

21

In support, the State cites Smith's testimony from trial when she explained why she invoked her Fourth Amendment right to refuse consent to a search of her home:

Q. Okay. And we've seen a video of police showing up on your doorstep?

A. Yes.

Q. And so why not just let them in and walk around?

A. Because I was afraid that they'd not handle the evidence correctly, stomp on everything, and tear everything up.

And then we had some concerns about my mom's weed pipes and some drug paraphernalia. Yeah.

The State argues that once Smith offered this explanation for invoking her rights, the prosecutor was permitted to respond by explaining why Smith might have invoked her right. The State argues these circumstances are like those in *State v. Folk*, where this Court found a prosecutor's comments on a defendant's Fifth Amendment right to stay silent did not rise to the level of fundamental error because the Court was "unable to conclude they were not made in response to Folk's explanation for not taking the stand." 162 Idaho at 635, 402 P.3d at 1088. The State's argument overlooks the fact that the prosecutor introduced Exhibit 4 before Smith testified, thus, Smith did not bring up her Fourth Amendment rights on her own initiative. As a result, Smith's statements explaining the invocation of her right are not a "sword" as the State proposes, making *Folk* readily distinguishable.

Ultimately, a prosecutor cannot use a person's exercise of her Fourth Amendment rights to imply guilt or to impeach the defendant. *Christiansen*, 144 Idaho at 470, 163 P.3d at 1182. That is what occurred in this case. The admission of Exhibit 4 and the prosecutor's comments during closing arguments were used to imply Smith's guilt. As a result, Smith has satisfied the first prong of the fundamental error test. *Perry*, 150 Idaho at 226, 245 P.3d at 978.

b. *Smith has failed to show the failure to object was not a tactical decision.*

Next, Smith contends that the second prong of *Perry* is satisfied because her attorney tried to get Exhibit 4 excluded on foundational grounds. Smith asserts this Court has addressed a similar situation in *Easley*, and held that the alleged violation was clear from the record because Easley's attorney objected to the prosecutorial veto on numerous grounds and tried very hard to get her into a mental health program. *Easley*, 156 Idaho at 221, 322 P.3d at 303. Likewise, in *Bodenbach*, this Court held the defendant easily satisfied the second prong of *Perry* because

defense counsel tried to prevent the jury from being instructed regarding an initial aggressor. 165 Idaho at 587, 448 P.3d at 1015.

The current circumstances are distinguishable because Smith's counsel never tried to exclude Exhibit 4 in its entirety. Instead, counsel simply wanted the State to call Lopez before playing the video because he thought "the police officers [were] exaggerating" what Lopez told them when the officers told Smith "[w]e have information out here that someone needs medical assistance." Smith's counsel's objection was that there may be insufficient foundation to play the tape until Lopez testified.

The second prong of *Perry* requires "the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision." *State v. Miller*, 165 Idaho 115, 119, 443 P.3d 129, 133 (2019). To satisfy this prong of *Perry*, a defendant bears the burden of showing clear error in the record. *Id*. This means the record must contain evidence of the error and the record must also contain evidence on whether trial counsel made a tactical decision in failing to object. If the record lacks evidence on whether counsel's decision was strategic, the claim is factual in nature and thus more appropriately addressed via a petition for post-conviction relief. *Id*. "Appellate counsel's opinion that the decision could not have been tactical does not satisfy the second prong of *Perry*." *Miller*, 165 Idaho at 119, 443 P.3d at 133. Smith failed to show that her attorney's failure to object to either the admission of Exhibit 4 or the prosecutor's closing argument was not a tactical decision. Thus, Smith has failed to satisfy the second prong of the fundamental error test.

### c. Any error in admitting Exhibit 4 did not affect the outcome of the case.

Even if the admission of Exhibit 4 or the prosecuting attorney's conduct constituted fundamental error, such error does not automatically require reversal. *Christiansen*, 144 Idaho at 471, 163 P.3d at 1183 (citing *Chapman v. California*, 386 U.S. 18 (1967)). The defendant must also demonstrate that the error affected the outcome of the trial proceedings. *Perry*, 150 Idaho at 226, 245 P.3d at 978. Smith highlights that, of the nearly 250 exhibits admitted, the jurors only asked to review one during their deliberations – Exhibit 4. While the jury's request to review Exhibit 4 during deliberations would seem to suggest that it affected the verdict, the State counters that any error in admitting Exhibit 4 was harmless because it was duplicative of other evidence admitted at trial. In particular, Exhibit 7, (to which Smith did not object at trial nor

challenge on appeal), showed the same exchange, with the same language, simply from a different camera angle. Smith counters that the focus of the third prong of the fundamental error test is on the effect of the erroneously admitted evidence, not on whether other evidence might have also had an impact. We recently clarified the third prong of *Perry* in *Miller*, holding the defendant is required to prove that the error identified in the first and second prongs actually affected the outcome of the trial proceedings. *See Miller*, 165 Idaho at 119–20, 443 P.3d at 133–34. Even if Exhibit 4 had been excluded, the jury would have received and considered the same information through Exhibit 7. Accordingly, Smith cannot demonstrate the admission of Exhibit 4 affected the outcome of trial where a virtually identical exhibit was also admitted without objection.

**D.     The cumulative error doctrine does not apply.**

Smith argues that the cumulative effect of the errors here deprived her of a fair trial. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Garcia*, 166 Idaho at ___, 462 P.3d at 1142–43 (quoting *State v. Johnson*, 163 Idaho 412, 428, 414 P.3d 234, 250 (2018)). "[A] necessary predicate to the application of the [cumulative error] doctrine is a finding of more than one error." *Perry*, 150 Idaho at 230, 245 P.3d at 982. Smith failed to prove that more than one error occurred at trial, thus, the cumulative error doctrine does not apply.

## V. CONCLUSION

We affirm Smith's judgment of conviction.

Justices BURDICK, BRODY, STEGNER and MOELLER, CONCUR.

24