# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50087

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Boise, November 2024 Term** |
| | ) | |
| **v.** | ) | **Opinion filed: February 6, 2025** |
| | ) | |
| **AARON ANSON VON EHLINGER,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Appellant.** | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Michael Reardon, District Judge.

The judgment of the district court is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise for Appellant. Erik R. Lehtinen argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kenneth Jorgensen argued.

_____

MOELLER, Justice.

Defendant Aaron Von Ehlinger was convicted of rape, Idaho Code section 18-6101, by an Ada County jury in 2022. On appeal, he argues that his judgment of conviction should be vacated due to constitutional and evidentiary errors committed by the district court during his trial. First, Von Ehlinger challenges the admission of a forensic nurse's testimony that repeated hearsay statements made to her by the victim, which he claims violated of his rights under the Confrontation Clause, as set forth in the Sixth Amendment of the United States Constitution. He argues that even though he failed to timely object to the testimony on Sixth Amendment grounds, its admission was fundamental error. Second, he argues that the district court erred by overruling defense counsel's objection to a leading question asked by the State during direct examination of the forensic nurse. Finally, he contends that there is insufficient evidence to support his conviction. For the reasons stated below, we affirm the judgment of conviction.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts were adduced from trial testimony and are undisputed, unless indicated otherwise. At the time of the incident in 2021, Von Ehlinger was a first-year member of the Idaho State House of Representatives from the Sixth District. The victim, J.V.,[1] was serving as a legislative intern for another State Representative.

In January of 2021, during the legislative session, Von Ehlinger became acquainted with J.V. Von Ehlinger and J.V. became friendly, having shared passing conversations in hallways and after committee meetings. At some point in January, Von Ehlinger gave J.V. his business card with his personal phone number written on the back. On February 7, 2021, J.V. texted Von Ehlinger's personal phone number, which led to a short text conversation between the two of them. Eventually, after J.V. texted Von Ehlinger again on March 2nd, they met outside the Capitol building and made plans to go out to dinner together the following week. On March 9, 2021, Von Ehlinger picked J.V. up from the Capitol building parking lot and drove to a local restaurant, where they had dinner together. They dined for approximately 3 hours and 20 minutes; neither of them consumed any alcohol.

Following dinner, Von Ehlinger drove J.V. to his nearby apartment in downtown Boise. At the apartment, Von Ehlinger and J.V. sat together on his couch and began to "make out" for approximately 10 minutes. At this point, the parties' testimony differs as to how their interaction unfolded. J.V.'s version, admitted at trial through the testimony of another witness, alleged that after arriving at the apartment and talking for a while, Von Ehlinger "picked her up and took her into the bedroom." After undressing and moving on to the bed together, Von Ehlinger then "digitally penetrated her vagina, pulled her bra and shirt down and fondled her breasts." Next, he "grabbed the back of her head with a handful of hair and pulled her head down towards his penis." In response, J.V. "attempted to pull her head back," which resulted in her "hit[ting] her head on the wall or headboard." J.V. stated that, at one point, Von Ehlinger "forced his penis into her mouth, ignoring her verbal objections." She alleged that Von Ehlinger then "sat on her chest, pinned her arms down, masturbated on top of her and then ejaculated on her stomach."

Von Ehlinger's recounting of the incident is quite different. He testified that they "both got up, held hands, and walked into the bedroom." After moving into the bedroom, Von Ehlinger maintains that he undressed while J.V. sat on the bed. Thereafter, "the physical intimacy

---

[1] To respect the privacy of the victim in this case, initials are used in place of her name.

progressed," and Von Ehlinger testified that he began "feeling J.V.'s breasts inside her shirt while she stroked his penis." According to Von Ehlinger, J.V. then "lifted herself up from laying down… leaned over as [he] was laying on [his] back… and she performed oral sex on" him for approximately 15 seconds. Von Ehlinger then moved on top of J.V., and they continued to kiss and engage in "physical touch," until J.V. indicated that "tonight probably isn't a good night to have sex." Thereafter, Von Ehlinger testified that he "manually stimulated himself and ejaculated on J.V.'s stomach."

After these events occurred, the evidence indicates that Von Ehlinger and J.V. "talked for a while on the bed." Von Ehlinger then drove J.V. back to her car by the State Capitol and dropped her off. Two days later, after J.V. reported the incident to the Assistant Sergeant of Arms for the House of Representatives, a detective from the Boise Police Department met with her at the Capitol. After meeting with J.V., the detective arranged for her to go to FACES of Hope ("FACES")—a local nonprofit organization designed to help victims of domestic violence and sexual abuse—to receive a sexual assault evaluation from a FACES nurse.

Ann Wardle was the on-call FACES nurse that day, and she conducted a sexual assault examination on J.V. at the FACES facility. Wardle is a forensically trained nurse and is nationally certified as a sexual-assault-nurse-examiner. She performed a brief physical examination of J.V. to ensure her health and "medical well-being," during which she observed a small bump on the back of J.V.'s head. When prompted, J.V. recounted the details of her interactions with Von Ehlinger to Wardle in a narrative form, providing an in-depth recounting of the events occurring on March 9, 2021. During this conversation, she conveyed to Wardle the mental impressions, emotions, and physical sensations she experienced at the time of the alleged assault. Wardle then wrote down the statements in a detailed report. J.V. specifically identified Von Ehlinger as the perpetrator. Lastly, Wardle administered a "sexual assault kit" on J.V., which involved collecting various forms of physical evidence from J.V.'s body, including oral and vaginal swabs, blood samples, and swabs from anywhere there might be a "bite mark, suck mark or other bodily fluids." The samples were then preserved as evidence and secured in an evidence locker on site. Later testing of the samples confirmed the presence of Von Ehlinger's DNA, a fact to which he stipulated at trial.

Eight months later, on November 11, 2021, the State charged Von Ehlinger by information with two felonies: Count I, Rape, Idaho Code section 18-6101, and Count II, Sexual Penetration by Use of a Foreign Object (i.e., digital penetration), Idaho Code section 18-6608. The matter

proceeded to a jury trial on April 26, 2022. At trial, the State called Wardle as its first witness. Wardle testified at length about J.V.'s sexual assault evaluation, recounting her professional background and the detailed statements J.V. made to her on March 11, 2021. As noted above, Wardle relayed J.V.'s statements that:

> [Von Ehlinger] grabbed the back of [J.V.'s] head with a handful of hair and pulled her head down towards his penis. And when she attempted to pull her head back, she hit her head on the wall or headboard. And then he sat on her chest, pinned her arms down, masturbated on top of her and then ejaculated on her stomach.

Wardle also provided the sole testimony (again by recounting J.V.'s statements) that Von Ehlinger "forced his penis into [J.V.'s] mouth," which was key to the State's case for the rape charge. While Von Ehlinger's defense counsel made various objections to Wardle's testimony, he never objected to it on the grounds that it violated Von Ehlinger's rights under the Confrontation Clause of the Sixth Amendment.

On day two of the trial, the State called J.V. to testify. On direct examination by the State, J.V. testified about the night of the alleged assault, recounting how she and Von Ehlinger went to dinner and eventually went back to his apartment. As depicted above, she testified that Von Ehlinger picked her up and carried her into his bedroom; that he "removed his clothes" and "climbed on top of me"; and that he "tried to put his fingers between my legs and I closed my knees." However, at that point in her testimony, J.V. expressed that she "[couldn't] do this any more," and left the courthouse and did not return. After a recess, the State informed the district court, out of the presence of the jury, that "[J.V.] was not in a current state where we can ask her to return to the courthouse." The district court then struck all of J.V.'s limited testimony, instructing the jury to "strike it from [their] minds, disregard anything [they] heard, and not to refer to it or rely on it in any way in [their] later deliberations."

As a result of the court striking J.V.'s testimony, the only specific evidence offered by the State regarding the events occurring between Von Ehlinger and J.V. on the night of the incident stemmed from Wardle's testimony, in which she recounted the statements J.V. had made to her during the sexual assault examination at FACES. Although Von Ehlinger's counsel discussed the possibility of moving for a mistrial with the district court, he never did so, nor did he ask the district court to strike Wardle's testimony on Confrontation Clause grounds. After the State rested, Von Ehlinger testified in his own defense. He did not contest that he had oral sex with J.V., but

maintained that such contact was consensual; however, he denied all allegations of digital penetration.

The jury ultimately found Von Ehlinger guilty of Count I, rape, but acquitted him of Count II, Sexual Penetration by Use of a Foreign Object. Von Ehlinger subsequently filed a motion for judgment of acquittal, or in the alternative, a motion for a new trial. The district court denied the motion and imposed a unified sentence of 20 years in prison, with the first 8 years fixed. Von Ehlinger timely appealed to this Court.

## II. STANDARDS OF REVIEW

"Whether admission of evidence violates a defendant's right to confront adverse witnesses under the Sixth Amendment's Confrontation Clause is a question of law over which this Court exercises free review." *State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015). However, this Court will defer to the trial court's factual findings unless they are clearly erroneous. *State v. Hooper*, 145 Idaho 139, 142, 176 P.3d 911, 914 (2007). "Alleged constitutional errors during trial that are not followed by a contemporaneous objection 'must be reviewed under the fundamental error doctrine.'" *State v. Medina*, 165 Idaho 501, 505, 447 P.3d 949, 953 (2019) (citation omitted).

"The trial court's broad discretion in admitting evidence will only be disturbed on appeal when there has been a clear abuse of discretion." *State v. Ehrlick*, 158 Idaho 900, 923, 354 P.3d 462, 485 (2015) (citation omitted). Under the abuse of discretion standard, this Court reviews whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

## III. ANALYSIS

At first glance, the primary issue in this case concerns the applicability of the Sixth Amendment's Confrontation Clause. Yet, before we can consider the constitutional underpinnings of this issue, we must first consider whether it has been properly preserved for appeal due to defense counsel's failure to raise a timely objection at trial. Thus, to make this determination, we must decide: (1) what Von Ehlinger's defense counsel actually objected to at trial and whether the district court responded correctly to these objections, and (2) if defense counsel failed to object to certain testimony on constitutional grounds, whether that failure was the result of a mistake or a tactical decision by defense counsel.

5

**A. Von Ehlinger has failed to demonstrate that the admission of Wardle's testimony was fundamental error.**

Von Ehlinger argues that the admission of J.V.'s statements made at the FACES facility through Wardle's testimony violated his right to confrontation as contained in the Sixth Amendment. More specifically, because Wardle repeated J.V.'s accusatory statements at trial, but J.V. walked out of court before Von Ehlinger could cross-examine her, he asserts that his Sixth Amendment right to confront and cross-examine his accuser was violated. However, the record shows that Von Ehlinger failed to make a contemporaneous objection to Wardle's testimony at trial on this basis. Instead, Von Ehlinger's counsel belatedly objected to the testimony a day later on hearsay and Confrontation Clause grounds. Even then, at no point—either during or after the trial—did Von Ehlinger's counsel move to strike Wardle's testimony.

*1.* State v. Perry *and the "fundamental error" doctrine.*

In Idaho, "where an error has occurred at trial and was not followed by a contemporaneous objection, such error shall only be reviewed where the defendant demonstrates to an appellate court that one of his unwaived constitutional rights was plainly violated." *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). Under this standard, known as the "fundamental error test," the defendant bears the burden of persuading the appellate court that the alleged error:

> (1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless. If the defendant persuades the appellate court that the complained of error satisfies this three-prong inquiry, then the appellate court shall vacate and remand.

*Id.* In cases where the record lacks evidence showing "clear error," *Perry* holds that "the matter would be better handled in post-conviction proceedings." *Id*.

Under *Perry*, Von Ehlinger bears the burden of first demonstrating that the admission of J.V.'s statements through Wardle's testimony violated his unwaived constitutional rights. Second, Von Ehlinger must demonstrate that the violation of his rights exists plainly on the record, which requires a showing that defense counsel's failure to object to Wardle's testimony on Sixth Amendment grounds was not a tactical decision. Third, Von Ehlinger must demonstrate that such error was not harmless. Because Von Ehlinger needs to satisfy each of *Perry's* three prongs, a failure to meet just one is fatal to his claim.

6

Von Ehlinger concedes that he failed to make a contemporaneous objection to Wardle's testimony on Confrontation Clause grounds, and does not dispute the applicability of the *Perry* fundamental error test here. Addressing the first prong of the test, Von Ehlinger argues that J.V.'s statements to Wardle were testimonial in nature; therefore, they were admitted in violation of his unwaived rights under the Confrontation Clause of the Sixth Amendment. In response, the State argues that J.V.'s statements were not testimonial, and were instead made for medical purposes, resulting in the proper admission of the statements. However, we need not address prong one at all. Even assuming, arguendo, that the admission of Wardle's testimony violated Von Ehlinger's unwaived Sixth Amendment rights, Von Ehlinger fails to meet the second prong of the test: establishing that such a violation plainly exists in the record. The failure to meet this prong of the fundamental error test is fatal to his claim.

To satisfy the second prong of the fundamental error test, the defendant "bears the burden of showing clear error in the record." *State v. Smith*, 168 Idaho 463, 481, 483 P.3d 1006, 1024 (2021) (citing *State v. Miller*, 165 Idaho 115, 119, 443 P.3d 129, 133 (2019)). "This means the record must contain evidence of the error and the record *must also contain evidence on whether trial counsel made a tactical decision in failing to object*." *Id.* (emphasis added). Importantly, "the error must be 'plain' which is synonymous with 'clear' or, equivalently, 'obvious.' " *Perry*, 150 Idaho at 225, 245 P.3d at 977 (quoting *U.S. v. Olano*, 507 U.S. 725, 734 (1993) (internal quotations marks omitted).When establishing that an error was not tactical, "[a]ppellate counsel's opinion that the decision could not have been tactical does not satisfy the second prong of [the fundamental error test]." *Miller*, 165 Idaho at 119, 443 P.3d at 133. Moreover, the fact that defense counsel's "fail[ure] to object could not have benefitted the defendant," is still not enough. *Id.* Instead, there must be evidence in the record that clearly demonstrates that the failure to object was not tactical. *Id.* In this way, there are parallels between the fundamental error test and the one employed to determine whether a trial-attorney's performance was defective for an ineffective assistance of counsel claim. *See generally State v. Dunlap*, 155 Idaho 345, 383-85, 313 P.3d 1, 39-41 (2013); *Strickland v. Washington*, 466 U.S. 668, 687, (1984). In such cases, when determining whether the lack of an objection by trial counsel was tactical, we begin with the strong presumption that counsel was competent and the trial tactics employed were based on sound legal strategy. *Dunlap*, 155 Idaho at 383-85, 313 P.3d at 39-41; *see also Johnson v. State*, 156 Idaho 7, 11, 319 P.3d 491, 495 (2014) (finding that this Court does not review the presumptively strategic or tactical decisions

of trial counsel "unless those decisions are based on inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review") (internal quotation omitted).

Thus, on appeal Von Ehlinger is tasked with showing that his defense counsel's failure to contemporaneously object to Wardle's testimony on Confrontation Clause grounds was clearly the result of error and not a tactical decision.

2. *Von Ehlinger has not established that a clear violation of his rights plainly exists on the record and that his failure to object was not a tactical decision.*

Because the facts presented here are atypical, context is necessary to properly understand how these issues played out at trial. On the first day of trial, Wardle testified as the State's first witness in its case in chief, repeating statements J.V. made to her during the sexual assault examination. The State also sought to admit State's Exhibit 5, which contained Wardle's notes from the FACES examination. Defense counsel contemporaneously objected to Wardle's testimony and Exhibit 5 on hearsay grounds, but did not object on the basis of the Confrontation Clause. Citing an exception to the hearsay rule, Idaho Rule of Evidence 803(4), the district court allowed Wardle's oral testimony, but sustained the hearsay objection as it pertained to Exhibit 5, directing the State to submit a redacted version of the exhibit later. Notably, these hearsay rulings have not been challenged on appeal.

The following morning, still before J.V. had taken the witness stand, the district court again addressed Exhibit 5 at Von Ehlinger's request. Defense counsel made a belated objection to Exhibit 5 on Confrontation Clause grounds. While making this objection, defense counsel stated that he "*would be* asking that the Court strike any testimony related to J.V.'s statements to Ms. Wardle." (Emphasis added). In response, the district court stated: "So there is a complicated analysis at work here. I'm mindful of your confrontation clause argument, but it is, as I have said, premature. So rather than spend that time on it now, let's take it up when it becomes important." Defense counsel responded by noting he was "just attempting to preserve a record," since there was a possibility that "J.V. might not testify." Again, notably, although defense counsel objected, he never followed through by moving to strike Wardle's testimony.

Later that day, J.V. testified briefly on direct examination by the State. Before getting into the ultimate issue in the case, the alleged nonconsensual sexual contact, J.V. became upset and left the courtroom without completing her direct examination or being subjected to cross-examination. In response, the district court completely struck her testimony and instructed the jury to disregard it. Thereafter, the district court inquired as to whether Von Ehlinger would be seeking a mistrial or

bringing a motion for acquittal. In response, defense counsel stated that he *intended* to make a Rule 29 Motion for acquittal, which would "also include a motion to dismiss under Rule 48." Defense counsel went on to state: "And, again, the argument—I'd like to make additional argument on the 6th Amendment, confrontation, both the amendment and due process clause." The district court responded by explaining that if Von Ehlinger included such arguments in a motion, it "would find" that the statements were not "elicited for purposes of testimony." Defense counsel responded to the district court by saying, "Okay." Again, defense counsel ultimately never made a motion to strike Wardle's testimony or dismiss based on the Confrontation Clause, and accordingly, the district court never ruled on either issue.

Von Ehlinger now asserts that the violation of his Sixth Amendment rights was clear and that "the record contains ample evidence" that his defense counsel's failure to object was not a tactical decision, but was instead a mistake. In support of his argument that the failure to object was not tactical, Von Ehlinger points to the two separate instances where defense counsel "attempted to cure his mistake" after he "discovered" it: first, the morning after Wardle testified, and second, after J.V. left the courtroom and her testimony was stricken. In both instances (which occurred the day after Wardle testified) defense counsel raised and discussed the Confrontation Clause issue with the district court. Von Ehlinger contends that by initially failing to raise the Confrontation Clause issue when Wardle testified, then later attempting to raise it, demonstrates that defense counsel "did not connect the dots" when Wardle was testifying, but realized his mistake later. Essentially, Von Ehlinger asserts that defense counsel was unaware of the Confrontation Clause issue when Wardle testified, which is why he did not initially object to the testimony on that ground, only to realize his mistake the next morning.

While this explanation is plausible, other facts in the record cast serious doubt on its certainty. Von Ehlinger's argument presupposes that his only opportunity to timely object to Wardle's testimony was when she was on the witness stand. While true that he could have conditionally objected to Wardle's testimony at the time she testified, Von Ehlinger also could have addressed the matter before trial via a motion in limine; or, he could have made a motion to strike Wardle's testimony after J.V. prematurely walked out of the courtroom. Von Ehlinger contends that his defense counsel was unaware of the Confrontation Clause issue until the morning after Wardle testified. However, even if that were true, it provides no support for the contention that the failure to object *after J.V.'s testimony was stricken* is attributable to the same mistake. At that point,

defense counsel was aware of the Confrontation Clause issue because he had discussed it with the district court earlier that morning. Thus, even if defense counsel made a mistake by initially failing to object to Wardle's testimony when she was on the stand, Von Ehlinger's proffered explanation is wholly unhelpful in determining whether (1) defense counsel made a mistake by failing to object when J.V. walked out of the trial the next day or, (2) whether defense counsel made a tactical decision that his best chance to win was to try and gain an acquittal from the jury in light of the victim's failure to testify.

We conclude that the record plausibly supports the conclusion that Von Ehlinger's trial counsel was aware of his Sixth Amendment rights and considered making an objection on that basis, but ultimately decided against doing so. Indeed, the facts in the record credibly support a view that the failure to object was a tactical decision. For example, after J.V. abruptly left the courtroom, defense counsel indicated a future intent to make a motion to strike on Confrontation Clause grounds, but ultimately refrained from making such a motion. The fact that defense counsel consciously contemplated making the motion suggests that his later decision *not* to make the motion may have been deliberate and tactical. While we need not determine now what the tactical considerations might have been, it is not hard to imagine potential reasons for not objecting. Von Ehlinger clearly wanted to avoid a mistrial because he told the district court he would not be asking for one. Yet, had Wardle's testimony been stricken, the chances of a mistrial being declared were increased. Defense counsel may have refrained from making a timely motion to strike because he favored his chances of winning an acquittal from the jury due to the victim possibly not testifying in a he-said, she-said rape case—as opposed to risking a mistrial that would permit the State to retry the case later with its evidentiary ducks all in a row. It is also possible that a shrewd attorney might attempt to "sandbag" or "hedge his bet" by purposefully allowing an error to remain in the record in order to create a path to reversal on appeal. *See State v. Kerr*, 163 Idaho 656, 659, 417 P.3d 982, 985 (Ct. App. 2018) (observing that the *Perry* test is "intended to prevent the litigant from sandbagging the court."). In sum, under *Perry* and *Miller*, we must determine that the failure to object was not a tactical decision. We cannot reach such a conclusion because the facts set forth above raise the specter that this was exactly what occurred.

The conversation between defense counsel and the district court regarding the potential motion for dismissal similarly reflects that the decision may have been tactical. In response to defense counsel's statement that he intended to make a Rule 48 motion for dismissal based on a

Confrontation Clause violation, the district court indicated that if defense counsel made such a motion, it "would not find" Wardle's statements to have violated Von Ehlinger's Confrontation Clause rights. Again, after this discussion, and despite indicating a previous intent to do so, defense counsel never made a motion to strike. This demonstrates the real possibility that defense counsel ultimately decided against making the motion simply because he anticipated that the district court would issue an adverse ruling on it. Again, based on these facts, it is simply not clear whether the failure to make the motion was a tactical decision or not; and Von Ehlinger's arguments do not clearly demonstrate that it was merely a mistake.

This Court's decision in *State v. Miller* sheds additional light on this inquiry. 165 Idaho at 122, 443 P.3d at 136. There, we applied the *Perry* fundamental error test to allegations of prosecutorial misconduct. *Id.* On appeal, the defendant argued that the prosecutor's comments during closing arguments were improper, despite trial counsel failing to contemporaneously object to the comments at trial. *Id.* This Court held that, because the defendant's trial counsel "rebutted the prosecutor's [allegedly improper] statements . . . in closing argument," it was not clear from the record that the failure to object was not a tactical decision. *Id*. at 126, 443 P.3d at 140. We pointed to specific statements made by defendant's trial counsel addressing and rebutting the substance of the prosecutor's allegedly improper statements, concluding that such rebuttal demonstrated the possibility of a tactical decision. "[B]ecause [defense] counsel rebutted the statement, [the defendant] has not shown that the failure to object was not a tactical decision by trial counsel." *Id.*

Here, Von Ehlinger asserts that defense counsel made a mistake resulting in fundamental error because he had "every reason to make a Confrontation Clause objection," but failed to do so. However, such an assertion by appellate counsel alone is not enough; and even more importantly, the facts supporting this contention are unconvincing. While Von Ehlinger provides a plausible explanation for defense counsel's behavior, he does not demonstrate that defense counsel's failure to object was obviously not a tactical decision. Based on the record before us, it appears just as plausible that defense counsel never entered an objection or motion to strike because he thought it would be unavailing, due to the district court's indication that it would render an adverse ruling to the motion. It is also plausible that defense counsel was aware of the error, yet was content to let it persist in order to gain an advantage in any appeal if Von Ehlinger was ultimately convicted. There is no doubt that J.V.'s departure weakened the State's case against Von Ehlinger. Defense

counsel might have determined it a wise strategy to take advantage of that fact and see the trial through without the complaining witness's testimony, while allowing for a potentially fundamental error to remain in the record to be appealed at another time, if necessary. Indeed, Von Ehlinger's defense counsel attempted to discredit Wardle's testimony by extensively cross-examining her and rebutting her testimony in his closing argument—acts we considered in *Miller* to be evidence of a tactical decision. *Miller*, 165 Idaho at 125, 443 P.3d at 139.

In sum, Von Ehlinger carries the burden of clearly demonstrating that the failure to object was *not* a tactical decision. *See State v. Miller*, 165 Idaho 115, 119, 443 P.3d 129, 133 (2019). We conclude that he has failed to plausibly dispel the possibility that the failure to object was a calculated and tactical choice. Whether such a tactic was wise or misguided is not for us to say in this appeal. Regardless, the result is that Von Ehlinger falls short of carrying his burden under the second prong of *Perry*. Therefore, after carefully reviewing the totality of the record, especially noting defense counsel's apparent strategy at trial—which was to admit that the alleged sexual conduct occurred but cast doubt on J.V.'s claim that it was nonconsensual—we hold that Von Ehlinger has failed to plainly demonstrate that the failure to object was not a tactical decision by his trial counsel. Because Von Ehlinger has not carried that burden, he fails to satisfy the fundamental error test.

**B. The district court did not commit reversible error by overruling Von Ehlinger's objection to the form of a question asked by the State.**

Von Ehlinger next contends that the district court committed reversible error by allowing the State to ask a leading question during its direct examination of Wardle. On the first day of trial, the State called Wardle as its first witness. After establishing a foundation for her testimony, the State began to question Wardle about the statements J.V. made to her during the sexual assault examination. The direct examination proceeded as follows:

State:        What did [J.V.] tell you took place inside of that apartment?
Wardle:       She said that they arrived—her and the assailant arrived at the apartment. She sat down, I believe, at some sort of table while he went to grab whatever they stopped by, and I think he also used the restroom or something. Anyways, when he came back out from the back room, he took her hand and told her to come sit on the sofa with him.

              At that time he started to stroke her thigh, attempted to kiss her, and then picked her up and took her into the bedroom, where she says he digitally penetrated her vagina, pulled her bra and shirt down and fondled her breasts, was kissing her all over. And he

|          |                                                                                                                          |
|----------|--------------------------------------------------------------------------------------------------------------------------|
|          | grabbed the back of her head with a handful of hair and pulled her head down towards his penis. And when she attempted to pull her head back, she hit her head on the wall or headboard. And then he sat on her chest, pinned her arms down, masturbated on top of her and then ejaculated on her stomach. |
| State:   | Did [J.V.] describe—you indicated she said he was sitting on her chest?                                                   |
| Wardle:  | Yes.                                                                                                                      |
| State:   | And where did she describe his knees being?                                                                               |
| Wardle:  | That they pinned her arms down so that she couldn't bring them up or forward.                                            |
| State:   | *And did she indicate that he was in this position before he forced his penis into her mouth?*                           |
| Defense: | *I'm going to object to leading.*                                                                                        |
| Court:   | *Sustained.*                                                                                                             |
| State:   | When did she indicate that the defendant straddled her and then put his knees onto her arms?                             |

(Empasis added). At that point, Wardle needed to refresh her recollection and had trouble reading her notes, so a short break in the examination occurred while Wardle was given eyeglasses. After her recollection was refreshed, the examination continued:

|          |                                                                                                                          |
|----------|--------------------------------------------------------------------------------------------------------------------------|
| State:   | When did she describe that the defendant straddled her and used his knees to pin her arms down?                          |
| Wardle:  | So she told me that when he pulled her head towards his penis and she said no, she aimed her head back, hit her head. And then she stopped, she said participating, and so he got on top of her at that point and pinned her arms down. |
| State:   | *And then he forced his penis into her mouth?*                                                                           |
| Defense: | *Objection, your Honor; leading.*                                                                                        |
| Court:   | *It seems to me that that testimony is already in, it was a question of timing that was being clarified. So, I'll overrule the objection.* |
| State:   | *Did I have my timing correct?*                                                                                          |
| Wardle:  | *Yes.*                                                                                                                   |
| State:   | Okay, thank you. What did she tell you happened after he forced his penis into her mouth?                                |
| Wardle:  | I don't remember her exact—what I wrote down, but at some point she, you know, she said I don't want to do this, I don't—I'm a mess, I haven't shaved, blah, blah, blah, and—yeah. I can't recall what I— what I wrote down. |

(Empasis added).

Von Ehlinger argues that the district court abused its discretion by overruling his objection to the State's leading question ("And then he forced his penis into her mouth?") on the grounds that such evidence was already admitted and properly before the jury. Von Ehlinger accurately

points out that, up to that point in the trial, "the State had failed to offer any evidence that [Von Ehlinger]'s penis had entered the oral opening of J.V.'s mouth, much less that it was done forcibly." Thus, Von Ehlinger argues that the district court erred by allowing the State to elicit that essential testimony through a leading question.

"The law is well settled that a question is leading when it suggests to the witness the answer sought." *Collins v. Parkinson*, 98 Idaho 871, 873, 574 P.2d 913, 915 (1978). Idaho Rule of Criminal Procedure 611(c) provides that, generally, leading questions "should not be used on direct examination except as necessary to develop the witness's testimony." I.C.R. 611(c). At the same time, the district court has considerable discretion in allowing leading questions. *McLean v. City of Lewiston,* 8 Idaho 472, ___, 69 P. 478, 479 (1902). To establish that an error was harmless, the State must "prove[] 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Perry*, 150 Idaho at 221, 245 P.3d at 973 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Assuming, arguendo, that the question was impermissibly leading, the State has met its burden of showing that the error was harmless.

Any error stemming from the State's questioning of Wardle was harmless for one conspicuous reason: Wardle never actually responded to the allegedly leading question. After defense counsel objected to the question at issue, and before Wardle answered, the district court overruled the objection and explained its decision. Nevertheless, Wardle did not answer the question. After the overruled objection, the State asked Wardle a *different*, clarifying question. Only then did Wardle respond to the *rephrased question*. There was no objection to the rephrased question, or to Wardle's answer.[2] Thus, any harm stemming from an answer to an improperly leading question was avoided here. Indeed, the primary danger of a leading question generally lies in the answer to it, rather than the mere posing of it in the first place. Here, the same result was reached as if the district court had sustained the objection: the question posed was never answered. For this reason, no damage was inflicted by the objected-to leading question and any error was harmless.

Beyond this, as the State points out, "the objection was merely to the form of the question, not the admissibility of the evidence elicited by the question." While this Court has not squarely

---

[2] To the extent that the rephrased question may have been related to and, thus, based on the original objected-to question, Von Ehlinger's failure to object to the rephrased question still precludes him from complaining of such error on appeal.

addressed this issue, other courts have concluded that an improperly phrased question does not constitute a reversible error on appeal. *See State v. Paciorek*, 137 Idaho 629, 635, 51 P.3d 443, 449 (Ct. App. 2002) (holding that "a failure to require the prosecutor to rephrase [leading] questions [is] not sufficiently prejudicial . . . ."). In *United States v. Rivera-Rodriguez*, 617 F.3d 581, 594 (1st Cir. 2010), the First Circuit held that "any error in the prosecution's use of leading questions [was] harmless where there is no evidence that leading questions prompted inaccurate testimony." We find this approach particularly apt here, where the State was merely attempting to have Wardle convey from memory what she had previously written down in the notes she took over a year earlier. It is uncontroverted that Wardle was not fabricating an answer out of whole cloth. This does not alter the fact that the question may have been leading but, importantly, it was not *misleading*; thus, it renders any error non-reversible under the First Circuit's analysis. Indeed, the testimony that Von Ehlinger alleges to have been improperly elicited (i.e., that Von Ehlinger "forced his penis into [J.V.'s] mouth,") was subsequently repeated by Wardle on numerous occasions, in response to non-leading questions. On both cross-examination and redirect-examination, Wardle confirmed that J.V. told her that Von Ehlinger forced his penis into her mouth.

For all these reasons, we conclude that any error attributable to the allegedly leading question objected to by Von Ehlinger did not contribute to the verdict. Consequently, we need not address whether the district court abused its discretion by overruling Von Ehlinger's objection to the question. Accordingly, Von Ehlinger has demonstrated no reversible error stemming from the form of the State's questions to Wardle.

## C. There is sufficient evidence to support Von Ehlinger's conviction of rape.

In his opening brief on appeal, Von Ehlinger challenged the sufficiency of the evidence underlying his conviction, arguing that his conviction should be vacated due to the errors committed during his trial. He argues that the admission of Wardle's testimony was improper (due to the constitutional and evidentiary issues addressed above) and that this Court should disregard such evidence when weighing whether there is sufficient evidence to support his conviction. Yet, as noted above, Von Ehlinger has failed to establish on appeal that Wardle's testimony was improperly admitted. Even more critically, in his reply brief, and later during oral argument on appeal, Von Ehlinger withdrew this argument, stating that the "State's arguments on that issue are well-taken" and, for this reason, Von Ehlinger opted to "withdraw[] the sufficiency of the evidence

15

issue." Therefore, we conclude that the evidence admitted in the record was sufficient to sustain a finding beyond a reasonable doubt by the jury that Von Ehlinger committed the crime of rape.

## IV. Conclusion

For the foregoing reasons, Von Ehlinger's judgement of conviction is affirmed.

Chief Justice BEVAN, and Justices Brody and Meyer and Gratton, J. Pro Tem, CONCUR.